278 F.3d 1335
 UNIVERSITY OF GREAT FALLS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Montana Federation of Teachers, Intervenor.
 No. 00-1415.
 United States Court of Appeals, District of Columbia Circuit.
 Argued December 4, 2001.
 Decided February 12, 2002.
 
 COPYRIGHT MATERIAL OMITTED On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Nicholas Trott Long argued the cause and filed the briefs for petitioner.
 Gene C. Schaerr argued the cause for amici curiae Association of Southern Baptist Colleges and Schools, et al., in support of petitioner. With him on the brief were James D. Jordan, Nicholas P. Miller, Joshua N. Schopf and Jeffrey A. Berman.
 David A. Seid, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney.
 J.C. Weingartner and David J. Strom were on the brief for intervenor.
 Before: SENTELLE and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 The University of Great Falls ("University") petitions this Court for review of a National Labor Relations Board's ("NLRB" or "Board") Decision and Order in an unfair labor practice proceeding against the University. University of Great Falls, 331 N.L.R.B. No. 188, 2000 WL 1283042 (Aug. 31, 2000) ("Great Falls"). The University argues that it is exempt from NLRB jurisdiction under the doctrine of NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq. (1994). The Board, however, concluded that the University did not "have a `substantial religious character,'" and asserted jurisdiction. Great Falls, 331 N.L.R.B. No. 188, at 4. Because we agree with petitioner that it is exempt from NLRB jurisdiction under Catholic Bishop, we grant the petition for review, vacate the decision and order, and deny the Board's cross-petition for enforcement. Because we determine that the NLRB lacks jurisdiction over the University, we do not reach the University's alternative claim that the Board erred in its determination that the collective bargaining unit included faculty, but not deans, as non-managerial employees.
 
 I. Background
 
 2
 On October 16, 1995, the Montana Federation of Teachers, AFT, AFL-CIO ("the Union") petitioned the NLRB to recognize the Union as the collective bargaining agent for the faculty of the University of Great Falls. The University declined to recognize the Union. The NLRB's Regional Director ordered a hearing. In that hearing and in all subsequent administrative proceedings, the University raised and preserved two principal objections to Board jurisdiction over it under the National Labor Relations Act ("NLRA" or "Act"). First, the University argued, the Board lacks jurisdiction over the University of Great Falls because it is a religiously operated institution not subject to the NLRA pursuant to the Supreme Court's decision in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Second, the University argued, even if it were subject to the jurisdiction of the Board, the Board could not order it to engage in collective bargaining with the Union because to do so would violate the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq. (1994) ("RFRA"), by substantially burdening the religious freedom of the University and its owners — Sisters of Providence, a Roman Catholic religious order — in the absence of a compelling governmental interest. While the University also preserved its objection to the bargaining unit, it is the religious/jurisdictional issues that are dispositive of the present litigation.
 
 
 3
 After the hearing, the NLRB Regional Director issued a decision extensively exploring the evidence of religious faith, practice and mission at the University and ultimately concluded that Catholic Bishop did not preclude Board jurisdiction over the University because "the propagation of a religious faith is not a primary purpose of UGF. Rather, the purpose and function of the institution are primarily secular." Decision and Direction of Election, University of Great Falls, Case 19-RC-13114, slip op. at 11 (NLRB Region 19, Feb. 20, 1996). As to the RFRA argument, the Director concluded that a collective bargaining order would not substantially burden the institution's free exercise of religion and that RFRA does not preclude the NLRB's assertion of jurisdiction over the employer. The Regional Director ordered the representation election by mail ballot of a defined faculty bargaining unit. The election occurred between March 8 and March 26, 1996, but the ballots were impounded pending an administrative review of the Director's decision. In the administrative review, the Board considered only the Religious Freedom Restoration Act issue and the bargaining unit objection. In November of 1997 it affirmed the Regional Director as to the bargaining unit, and ruled that the Religious Freedom Restoration Act argument was moot by reason of the Supreme Court's decision in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which it construed as declaring the RFRA unconstitutional. See University of Great Falls, 325 N.L.R.B. 83, 83 n. 2, 1997 WL 730651 (1997).
 
 
 4
 Following affirmance, the Regional Director issued a supplemental order in January 1998 certifying the Union as the exclusive collective bargaining representative of the faculty bargaining unit. Thereafter, the Union requested that the University bargain collectively. The University refused. The Board's Acting General Counsel issued an unfair labor practice ("ULP") against the University for its refusal to bargain collectively. The Board heard the case on cross-motions for summary judgment. After receiving the briefs of the parties on the RFRA issue, and reviewing the evidence received by the Regional Director in the representation and election proceedings, the Board granted the summary judgment motion of the general counsel, denied the motion of the University, and held that the University had committed an unfair labor practice by its refusal to bargain with the Union as the exclusive representative of the bargaining unit under sections 8(a)(5) and (1) of the Act. Great Falls, 331 N.L.R.B. No. 188, at 4.
 
 
 5
 Unlike the earlier proceedings, the Board did not dispense with RFRA on the basis of its unconstitutionality under City of Boerne v. Flores. The Board recognized that City of Boerne addressed only the constitutionality of the Act as applied to state and local law; that two circuits, the Eighth in Christians v. Crystal Evangelical Free Church, 141 F.3d 854 (8th Cir.), cert. denied, 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998), and the Ninth in Sutton v. Providence St. Joseph Medical Center, 192 F.3d 826 (9th Cir.1999), had held explicitly that the Supreme Court's decision did not invalidate RFRA as applied to federal law; and that two others, including this one, had issued decisions assuming without deciding that RFRA is constitutional as applied to federal law. See Adams v. Commissioner of Internal Revenue, 170 F.3d 173 (3d Cir.1999); Alamo v. Clay, 137 F.3d 1366 (D.C.Cir.1998). The Board further "recognized that it is beyond its authority, as an administrative agency, to adjudicate the constitutionality of congressional enactments ... a matter left to the courts." Great Falls, 331 N.L.R.B. No. 188, at 1. Therefore, the Board proceeded on the assumption that RFRA is constitutional as a limitation on federal statutory interpretation. The Board, however, ultimately determined that RFRA is not implicated in this case because, in the Board's view, the protection afforded the free exercise of religion under RFRA is less stringent than that provided to religious institutions under Catholic Bishop, and that therefore, if the Board's jurisdiction was not divested by Catholic Bishop, it plainly would survive the test of RFRA. The Board ruled that it did have jurisdiction under the Catholic Bishop test. The Board proceeded, then, to track the reasoning of the Regional Director, reviewing in detail the evidence of the religiosity of the University, and ultimately agreeing with the Regional Director that "the [University] is not involved with a religious institution in such a way that the Board's exercise of jurisdiction would even create a significant risk that First Amendment rights will be infringed." Id. at 4 (emphasis in original).
 
 
 6
 The Board therefore concluded that the Union continued as the exclusive representative of the bargaining unit under section 9(a) of the Act; that the refusal of the University to bargain was in violation of sections 8(a)(5) and (1) of the Act; and that the University had therefore engaged in unfair labor practices. The University filed the present petition for review.
 
 II. Analysis
 
 7
 "Since Catholic Bishop, the Board has decided on a case-by-case basis whether a religion-affiliated school has a `substantial religious character'" and whether it is subject to the NLRB's jurisdiction and to the requirements of the National Labor Relations Act. Great Falls, 331 N.L.R.B. No. 188, at 2. "The Board has not relied solely on the employer's affiliation with a religious organization, but rather has evaluated the purpose of the employer's operations, the role of the unit employees in effectuating that purpose, and the potential effects if the Board exercised jurisdiction." Id. at 2-3 (emphasis added). In making this evaluation the "Board considers such factors as the involvement of the religious institution in the daily operation of the school, the degree to which the school has a religious mission and curriculum, and whether religious criteria are used for the appointment and evaluation of faculty." Id. at 3 (emphasis added). The NLRB "will consider, on a case-by-case basis, all aspects of a religious school's organization and function that [it deems] relevant." Trustee of St. Joseph's College, 282 N.L.R.B. 65, 68 n. 10, 1986 WL 54219 (1986).
 
 
 8
 In this case, the Regional Director rested his conclusion that the Board had jurisdiction on the proposition that "propagation of a religious faith is not the primary purpose of the [University], but rather that the University's purpose and function are primarily secular." Great Falls, 331 N.L.R.B. No. 188, at 3-4. In reaching the same conclusion on the unfair labor practice proceeding, the Board expressly approved the Regional Director's reasoning, noting that the finding
 
 
 9
 relied, among other things, on the following: (1) the curriculum does not require the Catholic faith to be emphasized, nor is there in fact a particular emphasis on Catholicism; (2) the Respondent's board of trustees is not required to establish policies consistent with the Catholic religion; (3) the University's president and other administrators are lay persons who need not be members of the Catholic faith; (4) faculty members are not required to be Catholics, to teach Church doctrine, or to support the Church or its teachings; (5) students may come from any religious background, and no preference is given to applicants of the Catholic faith; of approximately 1450 students, only about 32 percent are Catholic; and (6) although undergraduate students are required to take one course in religious studies, the course does not have to be one involving Catholicism.
 
 
 10
 Id. at 4. After reciting these express findings, the Board declared that "the Regional Director had ample grounds for his conclusion that the [University] does not have a `substantial religious character' as did the schools involved in Catholic Bishop." Id. Therefore, the Board again expressed its adoption of the Regional Director's conclusion.
 
 
 11
 The University, supported by religious institutions which also claim exemptions from NLRB jurisdiction under Catholic Bishop,[1] contends that the very inquiry by the NLRB into the University's religious character, and the resulting determinations that the University "does not have a religious mission" and that "the propagation of a religious faith is not a primary purpose" of the University, University of Great Falls, Case 19-RC-13114, slip. op. at 10-11 (NLRB Region 19, Feb. 20, 1996), are in violation of the principles of the Supreme Court's decision in Catholic Bishop. We agree.
 
 
 12
 The Board reached the wrong conclusion because it applied the wrong test. As Catholic Bishop was decided on grounds of constitutional avoidance, we give no deference to the NLRB's application of this exemption to the National Labor Relations Act. Although we normally defer to an agency's interpretation of ambiguous statutory language under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), "here another even more important principle of judicial restraint weighs upon us," which is that "Federal courts traditionally have sought to avoid constitutional questions if at all possible." Meredith Corp. v. FCC, 809 F.2d 863, 872 (D.C.Cir.1987) (citing Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345-48, 56 S.Ct. 466, 482-84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). In other words, the constitutional avoidance canon of statutory interpretation trumps Chevron deference. See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574-75, 108 S.Ct. 1392, 1397-98, 99 L.Ed.2d 645 (1988); Chamber of Commerce of United States v. FEC, 69 F.3d 600, 605 (D.C.Cir.1995); Bell Atlantic Telephone Cos. v. FCC, 24 F.3d 1441, 1445 (D.C.Cir.1994). The Supreme Court, in Catholic Bishop, construed the NLRA so as to avoid deciding whether jurisdiction "was constitutionally permissible under the Religion Clauses of the First Amendment." Catholic Bishop, 440 U.S. at 499, 99 S.Ct. at 1318. It did so in the absence of "`the affirmative intention of the Congress clearly expressed'" to impose Board "jurisdiction over teachers in church-operated schools." Id. at 500-01, 99 S.Ct. at 1318-19. The application of Catholic Bishop to the facts of this case is thus an interpretation of precedent, rather than a statute, and for the court an occasion calling for the exercise of constitutional avoidance. "We are not obligated to defer to an agency's interpretation of Supreme Court precedent under Chevron or any other principle." Akins v. FEC, 101 F.3d 731, 740 (D.C.Cir.1996) (en banc), vacated on other grounds, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). "There is therefore no reason for courts — the supposed experts in analyzing judicial decisions — to defer to agency interpretations of the Court's opinions." Id. This is especially true where, as here, the Supreme Court precedent, and subsequent interpretation, is based on constitutional concerns, an area of presumed judicial, rather than administrative, competence. Id. In short, Chevron deference is not required. We therefore are governed by the Supreme Court's decision in Catholic Bishop, as we read it, not as it is read by the Board.
 
 
 13
 In Catholic Bishop the Court feared that NLRB jurisdiction over church-operated schools "will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the schools' religious mission." Catholic Bishop, 440 U.S. at 502, 99 S.Ct. at 1320 (emphasis added). As the Court stated, "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." Id. (emphasis added). The Court predicted that if the NLRA conferred jurisdiction, the Board could not "avoid entanglement with the religious mission of the school in the setting of mandatory collective bargaining." Id. Here the Board has engaged in the sort of intrusive inquiry that Catholic Bishop sought to avoid. As the Court feared, the Board has gone "beyond resolving factual issues" and engaged in inquiry into the "religious mission" of the University. Id. Here the "very process of inquiry leading to findings and conclusions" by the Board, as well as the Board's conclusions have implicated the First Amendment concerns at issue in Catholic Bishop. See id. at 502, 99 S.Ct. at 1319-20. The NLRB's "substantial religious character" test with its multifaceted analysis not only creates the same constitutional concerns that led to the Supreme Court's decision in Catholic Bishop, it is so similar in principle to the approach rejected in Catholic Bishop that it is inevitable that we must reject this "new" approach.
 
 
 14
 Moreover, since Catholic Bishop, at least a plurality of the Supreme Court itself has rejected "inquiry into ... religious views" as "not only unnecessary but also offensive," Mitchell v. Helms, 530 U.S. 793, 828, 120 S.Ct. 2530, 2551, 147 L.Ed.2d 660 (2000) (plurality opinion), declaring that "[i]t is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." Id.; see also Employment Div., Dep't of Human Res. of Ore. v. Smith, 494 U.S. 872, 887, 110 S.Ct. 1595, 1604-05, 108 L.Ed.2d 876 (1990); Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 718, 96 S.Ct. 2372, 2384-85, 49 L.Ed.2d 151 (1976). The prohibition on such intrusive inquiries into religious beliefs underlay the decision in Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), in which the Supreme Court upheld an exemption in Title VII of the Civil Rights Act as applied to the firing of a janitor by a church-owned gymnasium. There the Court noted the difficulty of judicially deciding which activities of a religious organization were religious and which were secular. "The line is hardly a bright one," the Court observed, "and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." Id. at 336, 107 S.Ct. at 2868-69. For this reason, even those Justices who filed separate concurrences in the judgment, expressed a belief that a non-profit institution owned or operated by a church should be exempted from "a case-by-case determination whether its nature is religious or secular" under Title VII. Id. at 340, 345, 107 S.Ct. at 2870-71, 2873.
 
 
 15
 Similar concerns were raised in Universidad Central de Bayamon v. NLRB, 793 F.2d 383 (1st Cir.1985) (en banc), a case with facts remarkably close to those before us. Bayamon involved a "`Catholic-oriented' institution of higher learning founded by the Dominican Order of the Roman Catholic Church," which "holds itself out to students, faculty and community as a Catholic school." 793 F.2d at 399-400. Writing for half of an equally-divided en banc court, then-Judge Breyer concluded that the analysis in Catholic Bishop applies equally well, not only to institutions that are "`pervasively sectarian,'" but also to a "college that seeks primarily to provide its students with a secular education, but which also maintains a subsidiary religious mission." Bayamon, 793 F.2d at 398-99. This conclusion is unsurprising; an exemption solely for "pervasively sectarian" schools would itself raise First Amendment concerns — discriminating between kinds of religious schools. See Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another"). Judge Breyer reasoned that "to fail to apply Catholic Bishop here is to undercut that opinion's basic rationale and purpose." Bayamon, 793 F.2d at 402. He found that Board jurisdiction posed just as great a risk of the "kind of `entanglement' — arising out of the inquiry process itself," as the Supreme Court feared in Catholic Bishop. Id. at 401. He concluded the NLRB's "ad hoc efforts, the application of which will themselves involve significant entanglement, are precisely what the Supreme Court in Catholic Bishop sought to avoid." Id. at 402-03. For the Board to exercise jurisdiction over an educational institution where "the inculcation of religious values is at least one purpose of the institution" and "to promise that courts in the future will control the Board's efforts to examine religious matters, is to tread the path that Catholic Bishop forecloses." Id. at 402 (emphasis in original).
 
 
 16
 Here too we have the NLRB trolling through the beliefs of the University, making determinations about its religious mission, and that mission's centrality to the "primary purpose" of the University. Smith teaches that "[i]t is no more appropriate for judges to determine the `centrality' of religious beliefs before applying a `compelling interest' test in the free exercise field, than it would be for them to determine the `importance' of ideas before applying the `compelling interest' test in the free speech field." Smith, 494 U.S. at 886-87, 110 S.Ct. at 1604-05. It cannot be any more appropriate for a Regional Director or the full Board to engage in such a determination. Indeed, "[j]udging the centrality of different religious practices is akin to the unacceptable `business of evaluating the relative merits of differing religious claims,'" but that is what the Board has set about doing. Id. at 887, 110 S.Ct. at 1604. The Supreme Court "[r]epeatedly and in many different contexts [has] warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim," id., and that admonition is equally applicable to the agencies whose actions we review.
 
 
 17
 Despite its protestations to the contrary, the nature of the Board's inquiry boils down to "is it sufficiently religious?" The Regional Director's opinion approved by the Board and the NLRB's brief before this Court present a dissection of life and beliefs at the University. Before the NLRB's Hearing Officer, the University president was questioned about the nature of the University's religious beliefs and how the University's religious mission was implemented: "So what you are saying is that the first part of your Mission Statement here, to implement the Gospel values and the teaching of Jesus within the Catholic tradition, may very well be sometimes contrary, which oftentimes it is, to other religious beliefs?" Transcript of Proceedings, University of Great Falls, Case 19-RC-13114, at 84, Dec. 12, 1994. The president was asked how to "jibe" the acceptance of other beliefs at the University with its teaching mission: "If we are teaching a course, we have a class here in witchcraft, and how do we meld that into the teaching of beliefs that Jesus and the strong Catholic tradition? They are contrary, aren't they?" Id. Further, the president was required to justify the method in which the University teaches gospel values, and to respond to doubts that it was legitimately "Catholic." He was asked, "What good is a Catholic institution unless we espouse the values and the teachings and the traditions of the Catholic Church?" Id. at 85. This is the exact kind of questioning into religious matters which Catholic Bishop specifically sought to avoid. Catholic Bishop, 440 U.S. at 502 n. 10 & 507-08, 99 S.Ct. at 1319 n. 10, 1322-23.
 
 
 18
 Catholic Bishop, along with the Court's subsequent decisions in Presiding Bishop v. Amos, Smith, and Mitchell, requires a different approach. Amici Curiae suggest a useful approach to applying Catholic Bishop that avoids the pitfalls encountered by the Board. This approach, drawn partially from Judge Breyer's controlling opinion in Bayamon, would exempt an institution if it (a) "holds itself out to students, faculty and community" as providing a religious educational environment (Bayamon, 793 F.2d at 400); (b) is organized as a "nonprofit" (Bayamon, 793 F.2d at 403; Catholic Bishop, 440 U.S. at 497, 99 S.Ct. at 1317); and (c) is affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion (Bayamon, 793 F.2d at 399-400; Catholic Bishop, 440 U.S. at 494, 99 S.Ct. at 1315-16). We find this Bayamon-based test to be such a useful and accurate method of applying Catholic Bishop that we adopt the same fully as to the first two steps, although we need not determine whether we reach the full expanse of the third step here. It is undisputed that the University is "affiliated with ... a recognized religious organization," that is, the Catholic Order of the Sisters of Providence, St. Ignatius Province. Therefore, we need not decide whether it would be sufficient that the school be, for example, indirectly controlled by an entity the membership of which was determined in part with reference to religion.
 
 
 19
 Our approach avoids the constitutional infirmities of the NLRB's "substantial religious character" test. It does not intrude upon the free exercise of religion nor subject the institution to questioning about its motives or beliefs. It does not ask about the centrality of beliefs or how important the religious mission is to the institution. Nor should it. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection," Thomas v. Review Bd., 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981), and to require an explanation of beliefs and how they are compatible with other aspects of life at the University is to tread upon that which the First Amendment protects. Further, this three-part approach avoids asking how effective the institution is at inculcating its beliefs, an irrelevant inquiry that permeates the NLRB proceedings below.
 
 
 20
 At the same time, however, it is a test that provides the Board and the courts with some assurance that the institutions availing themselves of the Catholic Bishop exemption are bona fide religious institutions. The first prong of the test, requiring an institution to show that it holds itself out as providing a religious educational environment, even if its principal academic focus is on "secular" subjects, Bayamon, 793 F.2d at 400, will help to ensure that the exemption is not given to wholly secular institutions that attempt to invoke it solely to avoid Board jurisdiction. Where a school, college, or university holds itself out publicly as a religious institution, "[w]e cannot doubt that [it] sincerely holds this view." Boy Scouts of America v. Dale, 530 U.S. 640, 653, 120 S.Ct. 2446, 2453, 147 L.Ed.2d 554 (2000). Indeed, whether an institution holds itself out to the public as religious may be a far more useful inquiry than any undertaken by the Board in this case. For such public representations serve as a market check. While public religious identification will no doubt attract some students and faculty to the institution, it will dissuade others. In other words, it comes at a cost. Such market responses will act as a check on institutions that falsely identify themselves as religious merely to obtain exemption from the NLRA. Thus, the requirement of public identification helps to ensure that only bona fide religious institutions are exempted.
 
 
 21
 The second element of the test, that the educational institution be organized as a non-profit entity, is consistent with the emphasis in Catholic Bishop and Amos on the distinction between non-profit institutions and profit-making businesses that may be owned by or affiliated with religious institutions. As the Amos Court noted, it is hard to draw a line between the secular and religious activities of a religious organization. See Amos, 483 U.S. at 336, 107 S.Ct. at 2868-69. However, it is relatively straight-forward to distinguish between a non-profit and a for-profit entity. It is also consistent with the history of the Board's interpretation of the NLRA: "As the Supreme Court observed in [Catholic Bishop], the Board's assertion of jurisdiction over nonprofit educational institutions is a relatively recent phenomenon." Bayamon, 793 F.2d at 403. Accordingly, non-profit institutions have a more compelling claim to a Catholic Bishop exemption than for-profit businesses.
 
 
 22
 Finally, as we observed above, the third element, at least in its simplest form, is directly analogous to Catholic Bishop. The school, college, or university must be "religiously affiliated." Catholic Bishop, 440 U.S. at 495, 99 S.Ct. at 1316.
 
 
 23
 This bright-line test will allow the Board to determine whether it has jurisdiction without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands. At the same time, this approach provides reasonable assurance that the Catholic Bishop exemption will not be abused.
 
 
 24
 The University of Great Falls easily satisfies this test. In its course catalogue, mission statement, student bulletin, and other public documents, it unquestionably holds itself out to students, faculty, and the broader community as providing an education that, although primarily secular, is presented in an overtly religious, Catholic environment. The University presents itself as a "private, independent Catholic university sponsored by the Sisters of Providence within the jurisdiction of the Catholic Bishop of Great Falls-Billings." University of Great Falls Catalogue, 1995-96, at 4. The University's mission statement does not just speak of general morality, but rather of "offer[ing] students a foundation for actively implementing Gospel values and the teachings of Jesus within the Catholic tradition." University of Great Falls Mission Statement. The mission statement further explains that the University "provides students with the opportunity to obtain a liberal education for living and making a living," "[a]s an expression of the teaching mission of Jesus Christ." Id. To that end, the University "offers students a foundation for actively implementing Gospel values and the teachings of Jesus within the Catholic tradition." Id. It fills its campus, indeed, every classroom and office with Catholic icons, not merely as art, but it claims as an expression of faith. Even the NLRB's Regional Director conceded that the University "refers to itself as a Catholic institution. It is listed in the Catholic Directory, a compilation of all institutions in the country recognized by the Church as being Catholic institutions." Decision and Direction of Election, University of Great Falls, Case 19-RC-13114, slip op. at 6 (NLRB Region 19, Feb. 20, 1996). It is a not-for-profit educational institution. Finally, it is sponsored by, its campus is owned by, and control is ultimately reserved to, a recognized religious organization — the Sisters of Providence, a religious order of nuns. To probe further into the University's beliefs is to needlessly engage in the "trolling" that Amos, Smith, Mitchell, and Catholic Bishop itself sought to avoid.
 
 
 25
 One danger of the NLRB's "substantial religious character" approach, is that when the Board seeks to assert jurisdiction, it may minimize the legitimacy of the beliefs expressed by a religious entity. It may have done so here. By emphasizing that only one-third of the student body is Catholic; that the University has retained an open admission policy and is available to all regardless of race, color, gender, age, religion, marital status, sexual orientation, and national origin; that the faculty need not be Catholic; that mass is not required; and that other views, including other religious views are tolerated, even respected, on campus, the Board would minimize the religious nature of the University. After making much of what is consistent with open-mindedness, the Regional Director, and subsequently the Board, concludes that "the purpose and function of the institution are primarily secular." Decision and Direction of Election, University of Great Falls, Case 19-RC-13114, slip op. at 11 (NLRB Region 19, Feb. 20, 1996). Thus the Board contends that the University is not entitled to the Catholic Bishop exemption. However, "there is something impossibly artificial about limiting the right in question to associations that formally and consistently disparage people of the type that those associations seek to exclude." Laurence H. Tribe, Disentangling Symmetries: Speech, Association, Parenthood, 28 PEPP. L. REV. 641, 650 (2001) (referring to freedom of association). Just as "freedom [of association] must surely include the right to express one's philosophy in implicit rather than explicit ways, to prefer inculcating one's beliefs with a velvet glove rather than an iron fist, and to opt for articulating one's views positively rather than negatively, focusing on the part of the glass that is `half full' rather than on the part that is `half empty,'" id. at 648-49, so too must free exercise of religion — the freedom that Catholic Bishop sought to preserve. If the University is ecumenical and open-minded, that does not make it any less religious, nor NLRB interference any less a potential infringement of religious liberty. To limit the Catholic Bishop exemption to religious institutions with hard-nosed proselytizing, that limit their enrollment to members of their religion, and have no academic freedom, as essentially proposed by the Board in its brief, is an unnecessarily stunted view of the law, and perhaps even itself a violation of the most basic command of the Establishment Clause — not to prefer some religions (and thereby some approaches to indoctrinating religion) to others. See Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982).
 
 
 26
 The Board argues, no doubt correctly, that wholly secular institutions can and do teach "character, competence, and community," as well as other caring values and virtues. But that says nothing about the religious nature of the University. Neither does the University's employment of non-Catholic faculty and admission of non-Catholic students disqualify it from its claimed religious character. Religion may have as much to do with why one takes an action as it does with what action one takes. That a secular university might share some goals and practices with a Catholic or other religious institution cannot render the actions of the latter any less religious. The University of Great Falls in its mission statement defines its mission "as an expression of the teaching mission of Jesus Christ." In its expression of its philosophy and purpose, it calls upon its faculty and staff to join with the students in developing "character ... competence... [and] commitment." But it goes further than that. It defines character in terms of recognition and acceptance of personal accountability by the students "to themselves, to society, and to God."
 
 
 27
 Likewise, the Board's analysis of the governing structure of the University is similarly inadequate to undermine the University's claim to religious exemption from Board jurisdiction. The Board stresses the role of the "secular" board of trustees in the control of the University. But, under the University's charter, the Sisters of Providence retain the ultimate authority to "adopt or change the mission, philosophy, and values," of the University, to "appoint and remove, with or without cause, the President of the University," to remove Trustees, to "approve the annual operating and capital budgets," and to "approve an annual or longer term strategic plan" for the University. Amended Bylaws of University of Great Falls (1995), at 2-3. That they choose not to exercise these powers may only demonstrate that they are satisfied that the University is fulfilling its religious mission. The president testified that he meets with the Sisters once a quarter, which is as frequently as the "secular" Board of Trustees convenes. The corporate structure is similar to that found in Trustee of St. Joseph's College, 282 N.L.R.B. 65, 1986 WL 54219 (1986), in which the Board allowed exemption. The NLRB's attempt to distinguish that case is unpersuasive. Both schools teach secular subjects, both offer mass but do not require it, both have non-Catholic faculty, both espouse belief in academic freedom. Both are religious schools trying to find their place in a twenty-first century world without giving up what makes them religious.
 
 
 28
 Under the Board's "substantial religious character" approach, it is hard to see what school or university that does not require attendance at religious services, or require students and faculty to be of a particular faith, would qualify for the Catholic Bishop exemption. Fortunately, as we have explained, Catholic Bishop does not require such a rigid approach, which would raise altogether different First Amendment concerns. Instead, in determining whether an institution is exempt from the NLRA under Catholic Bishop, the Board should consider whether the institution (a) holds itself out to the public as a religious institution; (b) is non-profit; and (c) is religiously affiliated.[2] If so, then the Board must decline to exercise jurisdiction. Because we find the University of Great Falls to be such an institution, we grant the petition for review.
 
 III. Other Claims
 
 29
 As the University is entitled to the Catholic Bishop exemption, we need not reach the University's claim that Board jurisdiction would violate the Religious Freedom Restoration Act, except to note the following: Contrary to the Board's view that "RFRA does not require the Board to alter the analysis that it has consistently undertaken under Catholic Bishop," Great Falls, 331 N.L.R.B. No. 188, at 3, RFRA presents a separate inquiry from Catholic Bishop. Under Catholic Bishop, the NLRB must determine whether an entity is altogether exempt from the NLRA. We have laid forth a bright-line test for the Board to use in making this determination. However, a ruling that an entity is not exempt from Board jurisdiction under Catholic Bishop may not foreclose a claim that requiring that entity to engage in collective bargaining would "substantially burden" its "exercise of religion." 42 U.S.C. § 2000bb-1(a). Moreover, even if the act of collective bargaining would not be a "substantial burden," RFRA might still be applicable if remedying a particular NLRA violation would be a "substantial burden." As none of these questions are properly before us, we need not explore them further. Also, because we have concluded that the University is not within the jurisdiction of the Board under the NLRA, we need not consider the University's alternative claim that the Board's determination of the bargaining unit was erroneous.
 
 IV. Conclusion
 
 30
 The National Labor Relations Board's approach to determining jurisdiction under Catholic Bishop is flawed. The "substantial religious character" inquiry raises the same constitutional concerns that animated the Supreme Court's decision in Catholic Bishop. In applying the Supreme Court's jurisprudence, we inquire whether the institution (a) holds itself out to the public as a religious institution; (b) is nonprofit; and (c) is religiously affiliated. Because we find that the University of Great Falls meets these criteria, and therefore is exempt from NLRB jurisdiction under Catholic Bishop, we grant the petition for review, vacate the decision and order of the NLRB, and deny the Board's cross-petition for enforcement. It is
 
 
 31
 
 So ordered.
 
 
 
 
 Notes:
 
 
 [1]
 The following entities filed a single Amicus Curiae brief in support of the University: The Association of Southern Baptist Colleges and Schools, The Association of Christian Schools International, Loma Linda University & Medical Center, Brigham Young University, Catholic University, University of the Incarnate Word, Pacific Union College, La Sierra University, Baylor University, Saint Leo University, The Seventh-Day Adventist Church-State Council, and Adventist Health
 
 
 [2]
 We need not and do not decide whether other indicia of religious character might replace "affiliation" in other cases