# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 4, 2008        Decided March 13, 2009

No. 07-1315

CARROLL COLLEGE, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
INTERVENOR

———

Consolidated with 07-1383

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

———

*Edward A. Brill* argued the cause and filed the briefs for
petitioner. *Lawrence Z. Lorber* entered an appearance.

*Arnold E. Perl* and *Ada Meloy* were on the brief of *amici
curiae* American Council on Education et al. in support of
petitioner.

*Steven B. Goldstein*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Catherine Trafton* argued the cause for intervenor. With her on the brief was *James B. Coppess*.

Before: HENDERSON, ROGERS, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The National Labor Relations Board ordered Carroll College to bargain with the recognized collective bargaining agent of its faculty. In this petition for review, the college argues that its religious educational environment and affiliation with the United Presbyterian Church place it beyond the Board's jurisdiction under *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), and *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002). We agree.

**I.**

Established in 1846, Carroll College is a private college located in Waukesha, Wisconsin, and affiliated with the Synod of Lakes and Prairies of the United Presbyterian Church of the U.S.A. The college has a school of liberal arts and sciences for undergraduates and a school of graduate and professional studies. Its governance structure is composed of a board of trustees, an administration, and a faculty.

In November 2004, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America-UAW, filed a petition with the NLRB seeking certification as the collective bargaining representative for Carroll's faculty. Carroll challenged the Board's jurisdiction, arguing that requiring it to bargain with the union would substantially burden its free exercise rights in violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1 (2000). In the alternative, Carroll argued that its faculty members are managerial employees not covered by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 152(3), 157 (2000), under *NLRB v. Yeshiva University*, 444 U.S. 672 (1980).

After a hearing to consider the union's petition, the Regional Director for the NLRB rejected both of the college's arguments. On the question of jurisdiction, the Regional Director saw no need to address the college's RFRA argument, interpreting Board precedent to foreclose such a challenge unless a school can show under *Catholic Bishop* that it is "church operated." *See* J.A. at 21–22 (citing *Catholic Bishop*, 440 U.S. at 507 (holding that church-operated schools are not subject to NLRB jurisdiction)). Carroll's affiliation with the Synod, the Regional Director concluded, was insufficient to meet this requirement. Reaching the merits, the Regional Director concluded that Carroll's faculty members are not managerial employees. J.A. at 38–45. Carroll filed a timely request to review the Regional Director's decision on jurisdiction and the merits, but stressed that its argument against NLRB jurisdiction was based solely on RFRA and not *Catholic Bishop*. *See* Resp't Br. add. 8.

The NLRB granted Carroll's request for review on the jurisdictional issue alone and concluded that it was no violation of RFRA to apply the NLRA's duty to bargain to the

college. *Carroll Coll., Inc.*, 345 N.L.R.B. 254, 254, 257–60 (2005). In the wake of the NLRB's decision, the Regional Director certified the union as the exclusive representative of Carroll's faculty. Carroll refused to bargain with the union, which drew an unfair labor practice charge from the General Counsel alleging a violation of sections 8(a)(5) and (1) of the NLRA. In its defense before the Board, Carroll presented once again the RFRA and managerial employee arguments it had first made to the Regional Director.

The NLRB granted the General Counsel's motion for summary judgment and ordered Carroll to recognize and bargain with the union. *Carroll Coll., Inc.*, 350 N.L.R.B. No. 30, at 1 (2007). With respect to Carroll's RFRA challenge, the NLRB repeated its earlier analysis and concluded again that the duty to bargain did not substantially burden the college's free exercise rights. *Id*. at 2–3. With respect to Carroll's argument that its faculty members are managerial employees, the Board used the Regional Director's earlier analysis and likewise concluded that they are not. *Id*. at 1–2. Carroll now petitions for review, and the NLRB cross-petitions for enforcement of its order. The union has intervened in support of the Board.[1] We have jurisdiction under 29 U.S.C. § 160(e), (f).

## II.

Before us, Carroll abandons the argument that the NLRB cannot, consistent with RFRA, order it to bargain with the union. Instead, Carroll asserts for the first time that the NLRB

---

[1] The American Council on Education, the National Association of Independent Colleges and Universities, the Council of Independent Colleges, and the Wisconsin Association of Independent Colleges and Universities filed an amici brief in support of Carroll's petition.

has no jurisdiction under *Catholic Bishop*. We begin with an explanation of *Catholic Bishop* and its progeny.

In *Catholic Bishop*, the Supreme Court read the NLRA in light of the Religion Clauses of the First Amendment to hold that the NLRB lacks jurisdiction over church-operated schools. 440 U.S. at 507. Central to the Court's reasoning was a concern that despite the best of intentions, a Board authorized to order collective bargaining at church-operated schools would, in many cases, find itself inquiring "into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id*. at 502. The First Amendment does not permit such inquiry. "It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions*." *Id*. (emphasis added). The Court saw "no escape" from these "serious First Amendment questions" if the Board was permitted to exercise jurisdiction over church-operated schools. *Id*. at 504.

But the Court offered no test for determining whether a school is beyond Board jurisdiction. In a series of decisions following *Catholic Bishop*, the NLRB created a framework for analysis that looked to whether a school has a "substantial religious character" to determine if it is exempt from jurisdiction. *See, e.g.*, *Livingstone Coll.*, 286 N.L.R.B. 1308, 1309–10 (1987); *Jewish Day Sch. of Greater Wash., Inc.*, 283 N.L.R.B. 757, 760–61 (1987); *Trustee of St. Joseph's Coll.*, 282 N.L.R.B. 65, 68 & n.10 (1986). The Board weighed, inter alia, the involvement of the affiliated religious group in the school's day-to-day affairs, the degree to which the school has a religious mission, and whether religious criteria play a role in faculty appointment and evaluation. *See Livingstone Coll.*, 286 N.L.R.B. at 1309–10. The "substantial religious

character" test allowed the Board to consider "all aspects of a religious school's organization and function that [it deemed] relevant." *St. Joseph's Coll.*, 282 N.L.R.B. at 68 n.10.

In *Great Falls*, we held that the Board's approach involved just "the sort of intrusive inquiry that *Catholic Bishop* sought to avoid," with "the NLRB trolling through the beliefs of [schools], making determinations about [their] religious mission, and that mission's centrality to the 'primary purpose' of the [school]." 278 F.3d at 1341–42. Accordingly, we read *Catholic Bishop* to require a much different and less intrusive inquiry. Drawing in large part on then-Judge Breyer's opinion in *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383 (1st Cir. 1986) (en banc), we fashioned a three-part inquiry. A school is exempt from NLRB jurisdiction if it (1) "'holds itself out to students, faculty and the community' as providing a religious educational environment," *Great Falls*, 278 F.3d at 1343 (quoting *Bayamon*, 793 F.2d at 400); (2) "is organized as a 'nonprofit,'" *id*.; and (3) "is affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion," *id*. We intended this test to create a "bright-line" rule for determining jurisdiction "without delving into matters of religious doctrine or motive." *Id*. at 1345. It would ensure that schools claiming a *Catholic Bishop* exemption "are *bona fide* religious institutions," *id*. at 1344, while avoiding Board inquiry into the substance and contours of their religious beliefs and missions, *see id*. at 1344–45.

To determine whether the University of Great Falls held itself out as "providing a religious educational environment," we looked to its course catalogue, mission statement, student bulletin, and other public documents. *Id*. at 1345. There was

no inquiry into the content of the school's religious beliefs nor skepticism whether those beliefs were followed. Probing into the school's religious views would "needlessly engage in the 'trolling' that . . . *Catholic Bishop* itself sought to avoid." *Id*. The second and third questions were easily answered. The school operated as a nonprofit and it was undisputed that it was affiliated with a recognized religious institution. *See id*. at 1343–45. There was no need to dig deeper. Doing so would only risk infringing upon the guarantees of the First Amendment's Religion Clauses.

## III.

Carroll easily satisfies the *Great Falls* test. The college's charter documents make clear that it holds itself out to students, faculty, and the broader community as providing a religious educational environment. Carroll's Articles of Incorporation describe its relationship with the Synod and provide that the college was incorporated "for the purpose of maintaining and conducting [itself] as a Christian liberal arts college dedicated to God." J.A. at 1102–03. Carroll's mission statement provides that the school will "demonstrate Christian values by . . . example." J.A. at 1093. The board of trustees has adopted a "Statement of Christian Purpose," which declares it the college's mission to provide "a learning environment devoted to academic excellence and congenial to Christian witness." J.A. at 1091. And Carroll and the Synod are parties to an agreement that commits the board of trustees of the college to "recognize and affirm [Carroll's] origin and heritage in the concern of the Church for the intellectual and spiritual growth of its students, faculty, administration, and staff." J.A. at 1129. These objective indicia easily satisfy the first element of our test. *See Great Falls*, 278 F.3d at 1345.

The Regional Director assumed the college could not challenge the Board's jurisdiction under RFRA unless it was exempt from Board jurisdiction under *Catholic Bishop*. As the NLRB had yet to adopt our *Great Falls* test, the Regional Director applied the NLRB's "substantial religious character" approach to conclude that Carroll is not exempt from the Board's jurisdiction under *Catholic Bishop*, but added a footnote explaining that he would reach the same conclusion under the three-part *Great Falls* inquiry. *See* J.A. at 23–25 & n.3. He found Carroll's "aspirational statements of principle and purpose" insufficient to establish that it holds itself out as a college providing a religious educational environment because there was little accompanying evidence of actual religious influence or control over the college or the education it provides. J.A. at 25 n.3. Not only does this heightened standard require a showing of religious influence far beyond what we found necessary in *Great Falls*, but it involves the type of inquiry *Catholic Bishop* forbids. In determining whether a school is exempt from the NLRA under *Catholic Bishop*, the NLRB may not "ask[] how effective the institution is at inculcating its beliefs." *Great Falls*, 278 F.3d at 1344. To do otherwise and require proof of "actual religious influence or control" as the Regional Director did here, J.A. at 25 n.3, is tantamount to questioning the sincerity of the school's public representations about the significance of its religious affiliation. This neither the Board nor we may do. *See Great Falls*, 278 F.3d at 1344 (stating that to avoid "constitutional infirmities," courts cannot "ask about the centrality of beliefs or how important the religious mission is to the institution").

As we determined in *Great Falls*, focusing solely on a school's public representations as to its religious educational environment—as opposed to conducting a skeptical inquiry into the actual influence exerted over the school by its

affiliated religious institution—is also a more useful way for determining the school's religious bona fides. *See id.* at 1344. The Regional Director's worry that Carroll's public statements of religious affiliation are "aspirational" and without practical effect is addressed by the incentives Carroll has to adhere to how it describes itself to the consuming public. "[S]uch public representations serve as a market check." *Id.* Not all students and faculty are attracted to overtly religious environments, so public representations of religious ties come at a cost to the school claiming a *Catholic Bishop* exemption. *See id.*

There is no dispute that Carroll meets the second element of *Great Falls*. It is a nonprofit institution. *See* J.A. at 1102 (Articles of Incorporation). The third element is also satisfied because Carroll is "affiliated with . . . a recognized religious organization," *Great Falls*, 278 F.3d at 1343. The college's Articles of Incorporation provide that it is "related" to the Synod of Lakes and Prairies of the United Presbyterian Church, J.A. at 1103, and Carroll, pursuant to an agreement with the Synod, is bound to "recognize and affirm its origin and heritage in the concern of the Church," J.A. at 1129. *See also* J.A. at 1814 (Course Catalogue) ("The college is affiliated with the Presbyterian Church."). Both the Regional Director and the NLRB acknowledged that Carroll and the Synod are affiliated. *See, e.g.*, *Carroll Coll.*, 345 N.L.R.B. at 254 ("Soon after the College was established . . . it 'affiliated' with the Presbyterian Church" and "[t]oday, that affiliation is recognized in the Articles of Incorporation."); J.A. at 25 n.3. The Regional Director determined, however, that because "the Church does not sponsor the College, does not own its campus, and does not have any right of ultimate control over it," the third element was not satisfied. J.A. at 25 n.3. Again, after *Great Falls*, this type of analysis requires too much. Although elements of religious ownership, operation, and

control were present in the facts before us in *Great Falls*, our test is met with affiliation alone. *See* 278 F.3d at 1343 (stating a school is exempt if it is "affiliated with, *or* owned, operated, or controlled . . . by a recognized religious organization" (emphasis added)). As the Board found, Carroll is plainly affiliated with a recognized religious organization.

There remains a complication in this otherwise straightforward application of *Great Falls*. Carroll did not raise the *Catholic Bishop* argument before the Board. *See* Pet'r Br. 26; *see also* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").[2] Certain jurisdictional challenges, however, need not be raised before the Board to be considered on review. "A court can always invalidate Board action that is patently beyond the Board's jurisdiction, even if the jurisdictional challenge was never presented to the Board." *Local 900, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 727 F.2d 1184, 1191 n.5 (D.C. Cir. 1984); *see also NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 388 (1946); *Noel Foods v. NLRB*, 82 F.3d 1113, 1121 (D.C. Cir.

---

[2] In both the proceedings below and its brief to this court, the NLRB stated that Carroll "explicitly conceded that the Board had jurisdiction over it." Resp't Br. 35. Not so. It is true that Carroll's post-representation hearing brief made clear that it was not claiming an exemption under *Catholic Bishop*. Resp't Br. add. 2; *see also id.* add. 8 (Request for Review) (arguing that the Board decided an issue that Carroll "did not raise"—namely, that "[t]he Board has 'jurisdiction' (whatever that *means*) over Carroll"). But this merely disclaimed reliance on *Catholic Bishop*, and there is a difference between Carroll's decision not to contest jurisdiction under *Catholic Bishop* and an express concession that jurisdiction exists.

1996). After our decision in *Great Falls*, Carroll is patently beyond the NLRB's jurisdiction.[3] *Great Falls* created a bright-line test of the Board's jurisdiction according to which we ask three questions easily answered with objective criteria. From Carroll's public representations, it is readily apparent that the college holds itself out to all as providing a religious educational environment. That it is a nonprofit affiliated with a Presbyterian synod is beyond dispute. From the Board's own review of Carroll's publicly available documents, *see Carroll Coll.*, 345 N.L.R.B. at 254–55, it should have known immediately that the college was entitled to a *Catholic Bishop* exemption from the NLRA's collective bargaining requirements. The Board thus had no jurisdiction to order the school to bargain with the union, and we have authority to invalidate the Board's order even though the college did not raise its jurisdictional challenge below.

## IV.

Under *Great Falls*, Carroll is exempt from the NLRB's jurisdiction. We thus need not address Carroll's argument that its faculty members are managerial employees who fall outside the protection of the NLRA. We grant Carroll's petition for review, vacate the decision and order of the NLRB, and deny the Board's cross-petition for enforcement.

*So ordered*.

---

[3] At oral argument, the Board pressed for a narrow reading of what constitutes action that is "patently beyond" its jurisdiction, arguing that so "long as [it] is purporting to decide a labor dispute, the Board has not . . . patently traveled outside the orbit of its authority." *See* Oral Arg. Recording at 29:39–30:05. But that cannot be right. For example, the NLRA does not reach labor disputes involving railroads. *See* 29 U.S.C. § 152(2). As we explain, *Great Falls* works a similar exemption from Board jurisdiction.