# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 11, 2018          Decided January 28, 2020

No. 18-1063

DUQUESNE UNIVERSITY OF THE HOLY SPIRIT,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ALLIED-INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,
INTERVENOR

Consolidated with 18-1078

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Stanley J. Brown* argued the cause for petitioner. With him on the briefs were *Arnold E. Perl*, *Joel Buckman*, *Ira M. Feinberg*, and *Amy Folsom Kett*.

*Erin E. Murphy* argued the cause for *amicus curiae* Association of Catholic Colleges and Universities in support of

petitioner. With her on the brief were *Paul D. Clement*, *Kasdin M. Mitchell*, and *Lauren N. Beebe*.

*Heather S. Beard*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Peter B. Robb*, General Counsel, *John W. Kyle*, Deputy General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Elizabeth Heaney*, Supervisory Attorney.

*James B. Coppess* argued the cause for intervenor. With him on the brief were *Amanda Fisher* and *Nathan Kilbert*.

*Michael S. Wolly* was on the brief for *amicus curiae* American Association of University Professors in support of respondent.

Before: ROGERS, GRIFFITH, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* PILLARD.

GRIFFITH, *Circuit Judge*: The National Labor Relations Board ordered Duquesne University, a Catholic school in Pennsylvania, to bargain with a union representing the school's adjunct faculty. Duquesne petitions for review, arguing that its religious mission places it beyond the Board's jurisdiction. We agree.

I

Duquesne was founded in 1878 by the priests and brothers of the Congregation of the Holy Spirit, a Catholic religious order also known as the Spiritans. Today, Duquesne is organized as a non-profit corporation led by the Spiritans, who

have exclusive authority over the university's mission and the appointment of its board of trustees, president, and officers.

Duquesne describes itself as a "Catholic University in the Spiritan Tradition." J.A. 70. That tradition, Duquesne explains, endeavors to "preach the Gospel to those who have never heard it, or to those who have barely heard it, with particular attention . . . to young people, and to our educational works." J.A. 297. As the university's mission statement puts it, "Duquesne serves God by serving students." J.A. 70.

Approximately 6,500 undergraduate and 3,000 graduate students attend Duquesne. They are taught by various types of faculty: tenured, tenure-track, non-tenure-track, executive, visiting, emeritus, and part-time adjuncts. Adjunct faculty members are hired for one semester at a time, and each may teach up to six credit hours per semester. In total, adjunct faculty teach approximately 44% of all credit hours in the Core Curriculum, which is what Duquesne calls its general-education requirements. The Core Curriculum includes courses in math, writing, science, philosophy, theology, and ethics.

In 2012, some of the adjuncts sought to unionize. The United Steel, Paper and Forestry, Rubber, Manufacturing, Allied-Industrial and Service Workers International Union, AFL-CIO-CLC (the "Union") petitioned the National Labor Relations Board (NLRB or the "Board") to certify it as the exclusive bargaining representative for the adjunct faculty in Duquesne's liberal arts college. At the time of the election, there were approximately eighty-eight such adjuncts in the proposed bargaining unit, and a majority voted for the Union. Duquesne ultimately asked the Board to vacate the election and dismiss the Union's petition. Relying on the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), and our decision in *University of Great Falls v. NLRB*,

278 F.3d 1335 (D.C. Cir. 2002), Duquesne argued that the National Labor Relations Act (NLRA)—when read in light of the Religion Clauses of the First Amendment—does not authorize the Board to exercise jurisdiction in this matter.

The Board's Regional Director rejected that argument. Applying the Board's decision in *Pacific Lutheran University*, 361 N.L.R.B. 1404 (2014), she concluded that the Board had jurisdiction because Duquesne did not hold out to the public that its adjunct faculty performed specific religious roles at the school. She then recommended that the Union be certified as the exclusive bargaining representative of the adjuncts. On review, a divided three-member panel of the Board agreed with the Regional Director, but the panel excluded from the bargaining unit adjunct faculty who teach theology. *Duquesne Univ.*, No. 06-RC-080933, 2017 WL 1330294, at *1 & n.3 (N.L.R.B. Apr. 10, 2017). The dissenting member would have held that the Board lacked jurisdiction. *Id.* at *1 (Member Miscimarra, dissenting).

Duquesne refused to bargain with the Union, which drew an unfair-labor-practice charge that was heard by a different three-member panel of the Board. The panel ordered Duquesne to bargain without revisiting the jurisdictional question. *Duquesne Univ.*, 366 N.L.R.B. No. 27, 2018 WL 1137769, at *1, *3 (Feb. 28, 2018).

Duquesne now petitions for review of the Board's decision and order, arguing that the Board lacks jurisdiction and that the Board's order violates the Religious Freedom Restoration Act. The Board cross-petitions for enforcement of its order. We have jurisdiction over the petition for review under 29 U.S.C. § 160(f), and over the cross-petition under § 160(e).

II

The Board began asserting jurisdiction over religious schools and their teachers in the 1970s. Since then, the Board has justified its jurisdiction in a variety of ways, but the Board's efforts have not met with success in the courts. The Supreme Court and the courts of appeals have held that the NLRA—read in light of the Religion Clauses—does not allow the Board to exercise jurisdiction in a series of cases over the past several decades. We reach the same conclusion in this case.

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Establishment Clause limits governmental involvement in the affairs of religious groups, and the Free Exercise Clause safeguards the freedom to practice religion, whether as an individual or as part of a group. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181-90 (2012). In tandem, the Religion Clauses establish a "scrupulous policy . . . against a political interference with religious affairs." *Id.* at 184 (quoting Letter from James Madison to Bishop Carroll (Nov. 20, 1806)).

The First Amendment "gives special solicitude to the rights of religious organizations," *id.* at 189, guaranteeing them "independence from secular control or manipulation," *id.* at 199 (Alito, J., joined by Kagan, J., concurring) (quoting *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). Religious organizations warrant First Amendment protections in part because "religious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987)

(Brennan, J., concurring in the judgment). For many Americans, religion cannot be exercised apart from religious organizations, and therefore "these organizations must be protected" by the First Amendment. *Id.* at 341-42 (quoting Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1389 (1981)).

Religious organizations are also employers potentially subject to the Board's jurisdiction under the NLRA. *See* 29 U.S.C. §§ 152(2), 158(a), 160(a). But recognizing the risk of violating the Religion Clauses, the Board "generally will not assert jurisdiction over nonprofit, religious organizations," and it disclaims jurisdiction over "religious institutions which operate in a conventional sense using conventional means." *St. Edmund's Roman Catholic Church*, 337 N.L.R.B. 1260, 1260 (2002). Typically, this means that the Board will not get involved in disputes between churches and their employees for fear of interfering with the churches' religious missions. *See, e.g.*, *id.* at 1261, 1266 & n.7 (church custodians); *Riverside Church*, 309 N.L.R.B. 806, 806-07 (1992) (church custodians, electricians, plumbers, and garage attendants, among others); *Faith Ctr.-WHCT Channel 18*, 261 N.L.R.B. 106, 107-08, 113 (1982) (broadcast engineers who worked at the church's television station); *see also Motherhouse of the Sisters of Charity*, 232 N.L.R.B. 318, 318 (1977) (service employees who worked at a religious order's convent and nursing home). Just like churches, schools may pursue a religious mission. Indeed, education is at the core of religious activity for many Americans. *See* Am. Br. of the Ass'n of Catholic Colls. & Univs. 15-20; *see also Hosanna-Tabor*, 565 U.S. at 177, 191-92; *id.* at 201 (Alito, J., joined by Kagan, J., concurring); *Catholic Bishop of Chi. v. NLRB*, 559 F.2d 1112, 1118 (7th Cir. 1977), *aff'd*, 440 U.S. 490. Yet the Board has taken a different approach to religious schools, asserting jurisdiction over them

and their teachers despite their religious missions, only to have courts hold that the Board's actions were not authorized by the NLRA.

The seminal decision is *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). In the decades before that case, the Board did not assert jurisdiction over private non-profit schools. *See id.* at 497; *Trs. of Columbia Univ. in the City of N.Y.*, 97 N.L.R.B. 424, 425-27 (1951). This changed in the 1970s, when the Board began to assert jurisdiction over private universities and high schools, including some religious schools. *See Cornell Univ.*, 183 N.L.R.B. 329, 334 (1970); *Shattuck Sch.*, 189 N.L.R.B. 886, 886 (1971); *Roman Catholic Archdiocese*, 216 N.L.R.B. 249, 250 (1975). The Board distinguished between schools it deemed "completely religious," which the Board continued to leave alone, and those it thought only "religiously associated," which the Board regulated. *Roman Catholic Archdiocese*, 216 N.L.R.B. at 250; *Cardinal Timothy Manning*, 223 N.L.R.B. 1218, 1218 (1976). Using this approach, the Board compelled Catholic high schools in Chicago and Indiana to bargain with unions representing lay teachers. *See Catholic Bishop*, 440 U.S. at 493-94.

The Supreme Court rejected the Board's approach. Reading the NLRA to avoid the risk of violating the Religion Clauses, the Court held in *Catholic Bishop* that the NLRA does not authorize the Board to exercise jurisdiction over teachers in a church-operated school, no matter whether the school is "completely religious" or merely "religiously associated." *Id.* at 500, 507. The Court explained that teachers play a "critical and unique role . . . in fulfilling the mission of a church-operated school." *Id.* at 501. This holds true regardless of whether the teacher provides instruction in religious or secular subjects. *See id.* at 501-02. Given this vital role played by

teachers, exercising jurisdiction over disputes involving teachers at *any* church-operated school presented a "significant risk that the First Amendment will be infringed." *Id.* at 502. For example, if a school took action against teachers for failing to comply with religious principles, an ensuing unfair-labor-practice proceeding might call upon the Board to determine whether the school's actions were justified "by their religious creeds." *Id.* This would "involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* The "very process" of such an inquiry threatened to "impinge on rights guaranteed by the Religion Clauses." *Id.* Furthermore, exercising jurisdiction would entangle the Board in the "terms and conditions of employment" of teachers, which would involve the Board in "nearly everything that goes on" in religious schools. *Id.* at 502-03 (internal quotation marks omitted). It would also "[i]nevitably . . . implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions." *Id.* at 503. Seeing "no escape from conflicts flowing from the Board's exercise of jurisdiction . . . and the consequent serious First Amendment questions that would follow," the Supreme Court held that the Board lacked jurisdiction over teachers in church-operated schools. *Id.* at 504, 507.

A few months after the Court rejected the Board's assertion of jurisdiction in *Catholic Bishop*, the Board claimed authority over religious colleges and universities, arguing that the holding of *Catholic Bishop* was limited to primary and secondary schools. *See Barber-Scotia Coll.*, 245 N.L.R.B. 406, 406 (1979). Religious colleges and universities were different, the Board argued, because "college students are less impressionable and less susceptible to religious indoctrination," "the internal discipline inherent in college courses minimizes the possibility of sectarian influence," and

"a high degree of academic freedom often exists at church-related colleges and universities." *Id.* The Board also decided that *Catholic Bishop* did not keep it from regulating schools that were "primarily concerned with providing a secular education, rather than with inculcating particular religious values." *Id.* at 407; *accord Universidad Cent. de Bayamon*, 273 N.L.R.B. 1110, 1110, 1113 (1984).

The First Circuit declined to approve of the Board's position in *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383 (1st Cir. 1985) (evenly divided en banc). Writing for half of the en banc court, then-Judge Breyer explained that *Catholic Bishop* prohibited the Board from distinguishing between religious schools that primarily teach secular subjects and those that seek to inculcate religious values more expressly and overtly. *See id.* at 402-03. The very inquiry needed to make that distinction would entangle the Board in religious affairs. *See id.* Importantly, Judge Breyer observed that exercising jurisdiction over either type of school risked violating the First Amendment, for religious values may "permeate the educational process" even at a school whose "predominant" mission is providing students with a secular education. *Id.* at 401-02. Judge Breyer also explained that *Catholic Bishop* applied to colleges and universities no less than other schools: "[T]he language of *Catholic Bishop* itself does not distinguish colleges from primary and secondary schools," and the risk of "state/religion entanglement . . . would seem as great in colleges as in secondary schools." *Id.* at 401. "Unfair labor practice charges would seem as likely; the Board's likely scrutiny would seem at least as intense; the necessary distinctions between religious and labor matters would seem no easier to make; and whether one could readily 'fence off' subjects of mandatory bargaining with a religious content would seem similarly in doubt." *Id.* at 403.

Following the Supreme Court's decision in *Catholic Bishop* and the First Circuit's decision in *Bayamon*, the Board developed a different approach to jurisdiction over religious schools, this time asserting authority over schools that lacked a "substantial religious character." *Univ. of Great Falls*, 331 N.L.R.B. 1663 (2000).

We categorically rejected the Board's test in *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), which involved faculty at the University of Great Falls, a Catholic school in Montana. We explained that determining whether a school had a "substantial religious character" involved the same "intrusive inquiry" and the "*exact* kind of questioning into religious matters which *Catholic Bishop* specifically sought to avoid," with "the NLRB trolling through the beliefs of the University, making determinations about its religious mission, and that mission's centrality to the 'primary purpose' of the University." *Id.* at 1341-43. "[T]he nature of the Board's inquiry," we observed, "boils down to 'is [the University] *sufficiently* religious?'" *Id.* at 1343. Such a question "creates the same constitutional concerns that led to the Supreme Court's decision in *Catholic Bishop*," as well its subsequent decisions in *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), and *Mitchell v. Helms*, 530 U.S. 793 (2000). *Great Falls*, 278 F.3d at 1341. In *Mitchell*, a plurality of the Supreme Court "rejected 'inquiry into . . . religious views' as 'not only unnecessary but also offensive.'" *Id.* (quoting *Mitchell*, 530 U.S. at 828). The same "prohibition on such intrusive inquiries into religious beliefs underlay the decision in *Presiding Bishop*." *Id.* at 1342. In that case, the Supreme Court "noted the difficulty of judicially deciding which activities of a religious organization were religious and which were secular," *id.*, observing that the line "is hardly a bright one . . . and an organization might understandably be concerned that a judge

would not understand its religious tenets and sense of mission," *id.* (quoting *Presiding Bishop*, 483 U.S. at 336).

To avoid the First Amendment concerns raised by the Board's new policy, we concluded that *Catholic Bishop*, along with *Mitchell* and *Presiding Bishop*, "require[d] a different approach." *Id.* at 1343. Thus was born our *Great Falls* test. "[I]n determining whether an institution is exempt from the NLRA under *Catholic Bishop*," we held that "the Board should consider whether the institution: (a) holds itself out to the public as a religious institution; (b) is non-profit; and (c) is religiously affiliated." *Id.* at 1347. "If so, then the Board must decline to exercise jurisdiction." *Id.* We described this as a "bright-line test" to "determine whether an entity is altogether exempt from the NLRA." *Id.* And we explained that the test "will allow the Board to determine whether it has jurisdiction without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands," thus avoiding the pitfalls of the Board's prior tests. *Id.* at 1345. At the same time, this approach reasonably assures that the exemption "will not be abused" because it applies only to schools that publicly represent that they provide a religious environment. *Id.* at 1344-45. Such representations serve as a "market check" because "public religious identification will no doubt attract some students and faculty to the institution," but "it will dissuade others." *Id.* at 1344.

After *Great Falls*, the Board issued several decisions assuming without deciding that our test governed its jurisdiction. *See, e.g.*, *Salvation Army*, 345 N.L.R.B. 550, 551 (2005); *Catholic Soc. Servs.*, 355 N.L.R.B. 929, 930 (2010). But the Board did not follow our test in asserting jurisdiction over a dispute involving faculty members at Carroll College, a Presbyterian school in Wisconsin that satisfied the *Great Falls*

test. We rejected the Board's decision even though the college never raised the jurisdictional issue before the Board. *Carroll Coll. v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009). The Board, we held, "should have known immediately" that the college was "patently beyond the NLRB's jurisdiction." *Id.* We stressed that "*Great Falls* created a bright-line test," and a school that satisfies this test "is exempt from NLRB jurisdiction." *Id.* at 572, 574. We also explained that in light of the Supreme Court's commands, we had made clear in *Great Falls* that the Board may not "question[] the sincerity of the school's public representations about the significance of its religious affiliation" or conduct a "skeptical inquiry" into whether an affiliated church exerts influence over the school. *Id.* at 572-74. The permissible inquiry is simple and limited. The Board must look "solely" at the school's "public representations as to its religious educational environment." *Id.* at 572-73. Anything more, "neither the Board nor we may do." *Id.* at 573.

In *Pacific Lutheran University*, 361 N.L.R.B. 1404 (2014), the Board created a new way to determine its jurisdiction over a religious school. Under the new test, a religious college or university seeking to avoid the Board's jurisdiction must first show that "it holds itself out as providing a religious educational environment." *Id.* at 1414. This threshold requirement is similar to our *Great Falls* test, but satisfying it is not enough to avoid the Board's jurisdiction. *Id.* at 1410. The school must also show that "it holds out the petitioned-for faculty members themselves as performing a specific role in creating or maintaining the college or university's religious educational environment, as demonstrated by its representations to current or potential students and faculty members, and the community at large." *Id.* at 1414.

Two members of the Board vigorously dissented. According to Member Miscimarra, "the Board should simply embrace and apply the three-part test articulated by the D.C. Circuit in *University of Great Falls*." *Id.* at 1429 (Member Miscimarra, dissenting in part). He pointed out that "every unfair labor practice decision by the Board may be appealed to the D.C. Circuit"; thus, "even if one disagreed with *Great Falls*, any attempt by the Board to chart a different path appears predestined to futility." *Id.* (citing 29 U.S.C. § 160(f)). Member Johnson argued that the "specific religious role" requirement of *Pacific Lutheran* "not only fails to avoid the First Amendment questions, it plows right into them at full tilt" by again calling on the Board "to judge the religiosity of the functions that the faculty perform." *Id.* at 1433-34 (Member Johnson, dissenting).

A divided Board applied the *Pacific Lutheran* test in this case. The panel acknowledged that Duquesne holds itself out as providing a religious educational environment, but the Board exercised jurisdiction because adjuncts outside the Theology Department are not held out as performing a specific role in creating or maintaining Duquesne's religious educational environment. *See* J.A. 69, 77-78; *Duquesne Univ.*, No. 06-RC-080933, 2017 WL 1330294, at *1 & n.3.[1]

---

[1] The Board has applied *Pacific Lutheran* to assert jurisdiction over several other religious schools, often with Board members dissenting or expressing "no opinion" on whether *Pacific Lutheran* was rightly decided. *See, e.g.*, *Loyola Univ. Chi. Emp'r*, No. 13-RC-168082, 2016 WL 3924182 (N.L.R.B. July 20, 2016); *Seattle Univ.*, 364 N.L.R.B. No. 84, 2016 WL 4437681 (Aug. 23, 2016); *Bethany Coll.*, No. 14-CA-201546, 2017 WL 6262290 (N.L.R.B. Dec. 6, 2017); *Saint Xavier Univ.*, 366 N.L.R.B. No. 31, 2018 WL 1256649 (Mar. 9, 2018); *Manhattan Coll.*, 366 N.L.R.B. No. 73, 2018 WL 2003450 (Apr. 27, 2018). Some of these religious schools have petitioned us for review. We are holding their petitions in abeyance

III

Duquesne argues that *Great Falls* and *Carroll College* foreclose the Board's jurisdiction. Our review is de novo. *See Great Falls*, 278 F.3d at 1340-41. We agree with Duquesne.

A

This case begins and ends with our decisions in *Great Falls* and *Carroll College*. In *Great Falls*, we established a "bright-line" test for determining whether the NLRA authorizes the Board to exercise jurisdiction in cases involving religious schools and their teachers or faculty. 278 F.3d at 1347. Under this test, the Board lacks jurisdiction if the school (1) holds itself out to the public as a religious institution (*i.e.*, as providing a "religious educational environment"); (2) is non-profit; and (3) is religiously affiliated. *Id.* at 1343-44. Seven years after *Great Falls*, we reiterated in *Carroll College* that this test governs the Board's jurisdiction, 558 F.3d at 572, 574, and we do so again today. This case involves faculty members and Duquesne satisfies the *Great Falls* test. The NLRA therefore does not empower the Board to exercise jurisdiction.

As an initial matter, the adjuncts here are clearly faculty members. In Duquesne's faculty handbook, the adjuncts who make up the bargaining unit are identified as "adjunct faculty" and listed among the different types of faculty at Duquesne. J.A. 768-70. Furthermore, the adjuncts possess the key attribute of faculty members: They educate students. In fact, according

---

pending the decision in this case. *See* Order, *Manhattan Coll. v. NLRB*, No. 18-1113 (D.C. Cir. June 26, 2018); Order, *Saint Xavier Univ. v. NLRB*, No. 18-1076 (D.C. Cir. Sept. 19, 2018).

to the faculty handbook, their *only* responsibility is teaching. *See* J.A. 770 ("As a rule, adjuncts are responsible only for teaching."). As we will explain below, it makes no difference whether the adjuncts are faculty members *who play a role in Duquesne's religious educational environment*. Once we determine that they are faculty members or teachers of any sort, the *Great Falls* test applies, and that test does not permit us to examine the roles played by the faculty members involved in the case.

Applying *Great Falls*, the Board lacks jurisdiction. The parties do not dispute that Duquesne satisfies the test. Nor could they. As the Board's Regional Director found, Duquesne is a non-profit school affiliated with the Catholic Church and the Spiritan religious order, and Duquesne holds itself out as providing a religious educational environment by publicly identifying itself as a Catholic institution guided by Catholic principles, providing regular Catholic religious services on campus, and encouraging students to participate in religious study groups, lectures, and projects. J.A. 69-71, 76-77; *see Great Falls*, 278 F.3d at 1345; *Carroll Coll.*, 558 F.3d at 573-74.

B

Apparently unpersuaded by *Great Falls* and *Carroll College*, the Board used its new *Pacific Lutheran* test to assert jurisdiction over Duquesne. *Pacific Lutheran* runs afoul of our precedent by claiming jurisdiction in cases that we have placed beyond the Board's reach. That is, *Pacific Lutheran* extends the Board's jurisdiction to cases involving faculty at schools that satisfy the *Great Falls* test, specifically those schools that (according to the Board) do not hold out the faculty members as playing a specific role in the school's religious educational environment. *Pac. Lutheran*, 361 N.L.R.B. at 1410. But our

precedent is clear: *Great Falls* is a bright-line test. If it is satisfied, the school is "altogether exempt from the NLRA," and "the Board must decline to exercise jurisdiction." *Great Falls*, 278 F.3d at 1347; *accord Carroll Coll.*, 558 F.3d at 572, 574-75. The Board may not "dig deeper" by examining whether faculty members play religious or non-religious roles, for "[d]oing so would only risk infringing upon the guarantees of the First Amendment's Religion Clauses." *Carroll Coll.*, 558 F.3d at 572. We have no power to revisit this precedent. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc); *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 165 (D.C. Cir. 2017).

The Board acknowledges that *Pacific Lutheran* cannot be squared with our precedent. *See Pac. Lutheran*, 361 N.L.R.B. at 1408-09. Indeed, in adopting its new test in *Pacific Lutheran*, the Board rejected *Great Falls* as an "overreach[]" that "goes too far." *Id.* at 1409. Rather than arguing that *Pacific Lutheran* follows our precedent, the Board claims that it "reasonably found" that *Great Falls*' "rationale for examining how a university holds itself out extends to consideration of how it holds out its faculty members." NLRB Br. 28. But *Great Falls* adopted a bright-line test, not a "rationale" that the Board may "extend" in a way that asserts jurisdiction over schools that the test places outside the Board's power.

For its part, the Union argues that *Pacific Lutheran* complies with our precedent because *Great Falls* "did not hold that the Board must decide jurisdiction . . . without regard for the role played by the faculty." Union Br. 29. According to the Union, the question simply "did not arise." *Id.* To the contrary, the question featured prominently in *Great Falls*. The test at issue—the Board's "substantial religious character" test—assessed the roles of the teachers who sought to unionize. For example, the test considered "the role of the unit employees in

effectuating the [college's religious] purpose" and whether "religious criteria are used for the appointment and evaluation of faculty." *Great Falls*, 278 F.3d at 1339 (quoting *Great Falls*, 331 N.L.R.B. 1663). And before us, the parties debated whether the university's faculty members played significant religious roles. *See, e.g.*, Univ. of Great Falls Br. 15-17, 24-25, 29-33, *Univ. of Great Falls v. NLRB*, No. 00-1415 (D.C. Cir. July 23, 2001); NLRB Br. 33-38, *Univ. of Great Falls v. NLRB*, No. 00-1415 (D.C. Cir. Sept. 10, 2001). Despite being confronted by the issue, we did not hold that the Board's jurisdiction was affected by the religious or non-religious roles played by the faculty members. Rather, we held that the NLRA does not empower the Board to exercise jurisdiction in cases involving schools with three particular features, none of which depend on the role played by the petitioned-for faculty members.

Our refusal to examine the roles played by various faculty members followed directly from *Catholic Bishop*. There, the Supreme Court recognized that teachers play a "critical and unique role" in advancing the mission of religious schools. *Catholic Bishop*, 440 U.S. at 501. This holds true, the Supreme Court explained, regardless of whether the teachers provide instruction in religious or secular subjects. No matter the subject taught, "a teacher remains a teacher," and "a teacher's handling" of even secular subjects may implicate the school's religious mission. *Id.* (internal quotation marks omitted). Because a school's religious mission may be "intertwined" with even "secular instruction," the Supreme Court did not differentiate between teachers who play religious roles and those who play secular roles, but rather held that the Board lacked jurisdiction over *all* teachers at church-operated schools. *Id.* at 501, 507 (internal quotation marks omitted).

Similarly, then-Judge Breyer explained in *Bayamon* that creating and administering distinctions between religious and secular instruction at religious universities "would itself entangle the Board in religious affairs." 793 F.2d at 402-03. This entanglement could not be avoided by crafting a bargaining unit that excludes faculty members who appear most closely tied to a university's religious mission; to create and administer such distinctions "is to tread the path that *Catholic Bishop* forecloses." *Id.* at 402. Furthermore, regardless of the roles played by the teachers involved in a case, Judge Breyer observed that permitting the Board to exercise jurisdiction risked entangling the government with the university's religious mission. *See id.* at 402-03. Board-mandated bargaining involving *any* teachers at religious universities would likely "concern the whole of school life," including the religious mission, *id.*, for "nearly everything that goes on in the school affects teachers and is therefore arguably a condition of employment," *id.* (quoting *Catholic Bishop*, 440 U.S. at 503).

*Great Falls* and *Carroll College* followed the same principles in holding that the Board's jurisdiction depends on three features of the religious school, not the roles played by the faculty members involved in the case. By contrast, *Pacific Lutheran* impermissibly intrudes into religious matters. The Board suggests that it can avoid constitutional problems by considering only whether a religious school "holds out" faculty members as playing a specific religious role, *Pac. Lutheran*, 361 N.L.R.B. at 1410; NLRB Br. 30, but such an inquiry would still require the Board to define what counts as a "religious role" or a "religious function." Just as the Board may not determine whether a university is "*sufficiently* religious," *Great Falls*, 278 F.3d at 1343, the Board may not determine whether various faculty members play sufficiently religious roles. Defining which roles qualify would be far outside the

competence of Board members and judges. *See Presiding Bishop*, 483 U.S. at 336; *Watson v. Jones*, 80 U.S. 679, 729 (1871); *Great Falls*, 278 F.3d at 1341-42; *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) (McConnell, J.). It would also lead to just "the sort of intrusive inquiry that *Catholic Bishop* sought to avoid," with the Board "trolling through the beliefs of the University," making determinations about its religious mission and whether certain faculty members contribute to that mission. *Great Falls*, 278 F.3d at 1341-42. This "is no business of the State." *Colo. Christian Univ.*, 534 F.3d at 1264. The "very process" of such an inquiry by the Board, as well as the Board's conclusions, would "impinge on rights guaranteed by the Religion Clauses." *Great Falls*, 278 F.3d at 1341 (quoting *Catholic Bishop*, 440 U.S. at 502); *see also Presiding Bishop*, 483 U.S. at 343-44 (Brennan, J., concurring in the judgment) (a "case-by-case" inquiry into whether an organization's activities are religious or secular entangles the government in religious affairs and "create[s] the danger of chilling religious activity" by disrupting "the community's process of self-definition").[2]

For example, consider how the Board intended to determine which faculty roles count as sufficiently religious. Some roles would qualify: "integrating the institution's religious teachings into coursework, serving as religious

---

[2] In rejecting *Pacific Lutheran*, we do not address whether the Board could exercise jurisdiction over a religious school that formally and affirmatively disclaims any religious role for certain faculty members. That issue is not presented here, for *Pacific Lutheran* held that the Board *has* jurisdiction unless the religious school shows that it holds out the faculty members as playing a specific religious role, which is not the same as a standard that says the Board *lacks* jurisdiction unless the religious school formally and affirmatively disclaims any religious role for certain faculty members.

advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training." *Pac. Lutheran*, 361 N.L.R.B. at 1412. But, the Board said, "general or aspirational statements" that faculty members must support the religious mission of a school would not establish that they play sufficiently religious roles, and "[t]his is especially true when the university also asserts a commitment to diversity and academic freedom, further putting forth the message that religion has no bearing on faculty members' job duties." *Id.* at 1411-12.

With these distinctions, the Board impermissibly sided with a particular view of religious functions: Indoctrination is sufficiently religious, but supporting religious goals is not, and especially not when faculty enjoy academic freedom. This "threaten[s] to embroil the government in line-drawing and second-guessing regarding matters about which it has neither competence nor legitimacy." *Colo. Christian Univ.*, 534 F.3d at 1264-65; *see Great Falls*, 278 F.3d at 1346; *Bayamon*, 793 F.2d at 402. And the Board's distinctions refuse to accept that faculty members might contribute to a school's religious mission by exercising their academic freedom, even though many religious schools understand the work of their faculty to be religious in just this way. Indeed, 194 schools (including Duquesne) represent that academic freedom is an "essential component" of their religious identities, critical to their mission of "freely searching for all truth." Am. Br. of the Ass'n of Catholic Colls. & Univs. 16-17 (quoting U.S. Conference of Catholic Bishops, *Ex Corde Ecclesiae: The Application to the United States* art. 2 (June 1, 2000)). This commitment to academic freedom does not become "any less religious" simply because secular schools share the same commitment, nor because it advances the school's religious mission in an "open-minded" manner as opposed to "hard-nosed proselytizing." *Great Falls*, 278 F.3d at 1346. Yet rather than accepting at face

value that academic freedom serves a religious function, the Board sees academic freedom as the opposite: a sign that "religion has no bearing on faculty members' job duties." *Pac. Lutheran*, 361 N.L.R.B. at 1411. The Board may not "second-guess" or "minimize the legitimacy of the beliefs expressed by a religious entity" in this way. *Colo. Christian Univ.*, 534 F.3d at 1265-66; *Great Falls*, 278 F.3d at 1345.

C

In the dissent's view, *Great Falls* and *Carroll College* never addressed whether "*adjunct* faculty . . . retain their NLRA rights." Dissent at 1. Instead, those decisions exempted only "permanent, full-time faculty." *Id.* But the dissent's theory assumes that *Great Falls* and *Carroll College* already allow the Board to retain jurisdiction over "non-faculty staff at avowedly religious schools." *Id.*; *see also id.* at 16-17. To the contrary, some language in those decisions seems to suggest that our "bright-line" test exempts *institutions* from the Board's jurisdiction—not categories of *employees*. *E.g.*, *Great Falls*, 278 F.3d at 1343 (exempting "an institution"); *Carroll College*, 558 F.3d at 572 (exempting a "school"). Thus, the dissent's fundamental premise—that the Board may still assert jurisdiction over *some* non-faculty employees—depends, at best, on a debatable reading of those decisions.

In any event, the dissent errs by asserting that adjuncts are somehow more like non-faculty employees than they are like faculty. Parsing the adjuncts' "terms of employment," *see* Dissent at 8-10, misses the forest for the trees. Adjuncts teach students, thus performing the "critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Catholic Bishop*, 440 U.S. at 501. Indeed, Duquesne itself says that a core element of its religious mission is education, *see* J.A. 70 ("Duquesne serves God by serving students."), adjuncts

teach nearly half of the Core Curriculum, and these Core classes "provide[] students with the opportunity to explore how religious faith and spiritual values enrich human life," J.A. 1090. In short, it is clear to us that adjuncts perform the mission-critical task of educating students at a "Catholic University in the Spiritan Tradition." J.A. 70.

The dissent's defense of *Pacific Lutheran* also underscores that decision's incompatibility with the Religion Clauses. In this case, following *Pacific Lutheran*, the Board's Regional Director found that reasonable adjunct candidates "would not conclude that *any religious responsibilities* were required by their job duties." J.A. 78 (emphasis added). The dissent sees nothing wrong with this analysis, and it describes *Pacific Lutheran*'s test as "non-intrusive." Dissent at 11. To the contrary, *Pacific Lutheran* led the Board's Regional Director to ask exactly the impermissible question: Would a "reasonable candidate" (in the Board's judgment, not Duquesne's) think an adjunct's responsibilities were sufficiently "religious"? J.A. 78. That question compels the Board (and federal courts) to "mak[e] determinations" about Duquesne's "religious mission" and about the "centrality" of these adjuncts to that mission. *Carroll College*, 558 F.3d at 572 (internal quotation marks omitted). *Pacific Lutheran* thus invites—and the dissent would allow—the very constitutional harms that *Great Falls* and *Carroll College* sought to avert.

\*\*\*

In sum, *Pacific Lutheran* runs afoul of our decisions in *Great Falls* and *Carroll College*, which continue to govern the reach of the Board's jurisdiction under the NLRA in cases involving religious schools and their faculty members or teachers. Accordingly, the Board has no jurisdiction here. We therefore need not address Duquesne's arguments that the

23

Board lacks jurisdiction for other reasons and that the Board has violated the Religious Freedom Restoration Act. Also, we need not resolve the extent of the Board's jurisdiction under the NLRA in cases involving religious schools and their non-faculty employees, nor must we address the powers of other agencies in cases involving different statutes or constitutional provisions. This is not one of those cases.

IV

We grant the petition for review, vacate the Board's decision and order, and deny the cross-application for enforcement.

*So ordered.*

PILLARD, *Circuit Judge*, dissenting: I disagree with my colleagues that this case "begins and ends" with *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), and *Carroll College, Inc. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009). Maj. Op. at 14. It is not at all apparent that temporary, part-time adjuncts whom the school does not even hold out as agents of its religious mission necessarily fall within an exemption from the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*., that was drawn to account for the "critical and unique role" of faculty in "fulfilling the mission of a church-operated school." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 501 (1979). The parties, my colleagues, and I agree that full faculty are exempt, and that this case does not address the applicability of the NLRA's workplace protections to non-faculty staff at avowedly religious schools. Instead, the dispute is over application of the exemption to *adjunct* faculty, an issue no court has yet decided. Are adjuncts exempted under *Catholic Bishop* on religious grounds, like permanent faculty, or do they, like religious schools' other personnel, retain their NLRA rights?

The test the National Labor Relations Board (Board or NLRB) applied to resolve that open question derives not from this case, but from *Pacific Lutheran University*, 361 N.L.R.B. 1404 (2014), yet this is the first petition asking us to review it. The Board ruled that adjunct faculty may be exempted, but only where the university "holds [them] out" as "performing a specific role in creating or maintaining the university's religious purpose or mission." *Id*. at 1411. This deferential standard avoids any intrusive review of the teachers' actual duties, requiring only that schools provide clear notice that they cast their adjuncts in a religious role. The Board then accepts at face value the schools' representations to that effect. Applying a holding-out requirement to adjuncts seeks to ensure that the exemption is not applied where it serves no purpose. I believe that modest requirement is more consistent with the competing concerns here than the majority's blanket

conclusion that all adjuncts at a religious university serve a religious function, even where their employer has never held them out as doing so.

The Board's approach has several advantages. It faithfully adapts the holding-out method we articulated in *Great Falls* and *Carroll College*, using it to apply *Catholic Bishop* to a type of religious-school employee not yet addressed. It recognizes the significant structural and functional differences between adjuncts and full faculty at many schools, as well as the heterogeneity of schools' religious exercise. It thereby not only respects precedent and protects religious exercise, but also affords schools leeway to delineate for themselves the scope of the academic teaching corps that embodies their religious mission. In contrast to the automatic presumption of religiosity that the court adopts today, the Board's approach adds a measure of tailoring at the exemption's outer edge, eliminating needless sacrifice of adjuncts' NLRA rights but extending the exemption to them where called for by a religious role the school itself identifies.

## I.   Background

### A.  The Implied NLRA Religious-Teacher Exemption

The First Amendment's Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990). The NLRA is such a law. It protects employees' right to organize, join together, and bargain collectively with their employers. *See* 29 U.S.C. § 157. It defines "employee" without exception for teachers, *id*. § 152(3), and "employer" without exception for religiously affiliated schools, *id*. § 152(2). In sustaining an NLRA bargaining unit of professional opera singers, we quoted the Supreme Court's characterization of "[t]he breadth of § 2(3)'s

definition" of "employee" as "striking." *Seattle Opera v. NLRB*, 292 F.3d 757, 762 (D.C. Cir. 2002) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891 (1984)). "[T]he Act squarely applies to 'any employee.' The only [textual] limitations are specific exemptions for agricultural laborers, domestic workers, individuals employed by their spouses or parents, individuals employed as independent contractors or supervisors, and individuals employed by a person who is not an employer under the [Act]." *Id*. (emphasis omitted). And we have been directed to "take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996).

The Supreme Court implied an NLRA exemption for regular parochial high school teachers in *Catholic Bishop*. *See* 440 U.S. at 493 n.5. The exemption sprang from both the religious nature of the schools and "the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Id*. at 501. In view of the teachers' central role in "the propagation of a religious faith," which is a "*raison d'être* of parochial schools," *id*. at 503, the Court sought to avoid the constitutional shoals of regulating teachers who are "under religious control and discipline," *id*. at 501 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971)). Invoking Establishment Clause precedent disallowing governmental support to parochial schools, the Court thought that collective bargaining on behalf of religious-school teachers raised a risk—similar to the risk from monitoring public funds—of governmental "entanglement with the religious mission of the school." *Id*. at 502.

Rather than decide that teachers' exercise of NLRA rights at a religious high school would violate the First Amendment, the Court in *Catholic Bishop* invoked constitutional avoidance

to read the statute as inapplicable to them. The Court acknowledged that the NLRA "defined the Board's jurisdiction in very broad terms," *id*. at 504, and that the legislative history did not refer to religious schools or their teachers, *see id*. at 504-06. The absence of any "clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board," the Court reasoned, supported construing the NLRA not to reach those teachers. *Id*. at 507. The Court thus steered clear of "difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses" that might ensue from collective representation of parochial-school teachers. *Id*.

The Court in *Catholic Bishop* "offered no test" for applying the exemption, *Carroll Coll.*, 558 F.3d at 571, so the Board and lower courts worked to differentiate schools whose teachers could legitimately be exempted from those whose teachers could not. Because the Supreme Court has never passed on how the size, complexity, heterogeneity, and academic freedom that characterize many religious institutions of higher education might differentiate them from the parochial schools in *Catholic Bishop*, it has fallen to the appellate courts to decide how to apply the religious-teacher exemption to faculty at religious colleges and universities.

### B. Our NLRA Cases Do Not Address Adjunct Faculty

In *Great Falls*, we rejected the Board's attempt to apply *Catholic Bishop* through a case-by-case inquiry into "whether a religion-affiliated school has a substantial religious character." 278 F.3d at 1339. Instead, we adopted a three-part analysis that, in the context of a petitioned-for faculty bargaining unit, entitles a school to the *Catholic Bishop* exemption if it (1) is "religiously affiliated;" (2) is "non-profit;" and (3) "holds itself out to the public as religious." *Id*.

at 1344-45. The central functions of *Great Falls'* holding-out test are twofold: First, by accepting a school's publicly communicated religious self-description, it prevents second-guessing the school's "motives or beliefs" to determine whether it has a sufficiently "substantial religious character" to claim the *Catholic Bishop* exemption. *Id*. at 1344. And, second, because "public religious identification . . . comes at a cost" to the school claiming it, the unusually deferential holding-out inquiry provides "reasonable assurance that the *Catholic Bishop* exemption will not be abused" to exempt employees whose NLRA rights should be recognized. *Id*. at 1344-45. We explained that, insofar as entitlement to the exemption hinges on a school's "public religious identification," it is unlikely to be claimed where it is not warranted because the avowed religiosity "will no doubt attract some students and faculty to the institution," but "will dissuade others." *Id*. at 1344. We applied the exemption in *Carroll College* even though the college had not asserted it before the Board, reasoning that the exemption is jurisdictional so could be "considered on review" even if not "raised before the Board." 558 F.3d at 574.

While *Carroll College* and *Great Falls* decided when a nonprofit, religiously affiliated university sufficiently "holds itself out to the public as a religious institution" to place *Catholic Bishop*'s jurisdictional exemption in play, *Great Falls*, 278 F.3d at 1347, those decisions did not address whether a bargaining unit composed of temporary, part-time adjuncts, like units of other, non-faculty employees of the institution, falls beyond that line. Critically, the petitioned-for faculty bargaining units we confronted in *Carroll College* and *Great Falls* expressly excluded adjuncts. *See Carroll Coll., Inc.*, 350 N.L.R.B. No. 30 (2007), *vacated*, 558 F.3d at 575; *Univ. of Great Falls*, 331 N.L.R.B. No. 188 (2000), *vacated*, 278 F.3d at 1348. The faculty unit at issue in *Bayamon*—a

decision that influenced us in *Great Falls*, *see* 278 F.3d at 1342-43—likewise excluded "all part-time teaching personnel." *Universidad Cent. de Bayamon*, 273 N.L.R.B. 1110, 1111 (1984), *enforcement denied, Universidad Cent. de Bayamon v. NLRB*, 793 F.2d 383, 403 (1st Cir. 1985) (equally divided *en banc*) (Breyer, J.). Instead, those cases each addressed only bargaining units composed of regular faculty, *i.e.*, the university bodies most analogous to the parochial-school faculty that *Catholic Bishop* saw as a conduit for the propagation of the faith, so their analyses of institutional religiosity and employees' religious involvement merged in the same way as in *Catholic Bishop*. But no court has previously faced a situation where, as here, the proposed bargaining unit is composed exclusively of *adjunct* teachers structurally distinct from the main faculty and not held out as playing the kind of role in the school's religious mission that justified the faculty exemption in *Catholic Bishop*.

Because adjuncts often have a very different role from permanent faculty, it makes sense to treat as distinct the question whether adjuncts are exempted. Indeed, the Board has long differentiated adjuncts from full faculty, concluding that "the differences between the full-time and part-time faculty are so substantial in most colleges and universities" that certain "part-time faculty"—including "adjunct professors"—"do not share a community of interest with full-time faculty and, therefore, should not be included in the same bargaining unit." *N.Y. Univ.*, 205 N.L.R.B. 4, 6 (1973); *see also Kendall Coll. v. NLRB*, 570 F.2d 216, 219-20 (7th Cir. 1978). Schools employ adjuncts in many different ways, and those differences can be material to whether recognition of adjuncts' NLRA rights would pose a risk to the university's religious exercise. Asking that the university hold out its adjuncts as part of its religious function adequately accounts for any such risk.

The Board's differentiation of adjuncts from full faculty echoes another recognized distinction within university teaching ranks that affects NLRA coverage: While permanent faculty often participate in governance, adjuncts typically do not. Thus, in the very first judicial decision applying *Catholic Bishop* to higher education, the divided *en banc* First Circuit in *Bayamon* stressed that its treatment of religious-university faculty accorded with "the existence of other, related limitations upon the Labor Board's jurisdiction over university teachers." 793 F.2d at 398. The NLRA "limitation[]" to which *Bayamon* adverted is the managerial exemption. The faculty managerial exemption applies to faculty that participate in faculty self-governance by virtue of "various 'management' prerogatives over appointments, schedules, and curriculum." *Bayamon*, 793 F.2d at 399 (quoting *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 690 (1980)); *see also Catholic Bishop*, 440 U.S. at 504-05 (noting Senate Committee's reference to "a college professor's dispute with the college as an example of employer-employee relations *not* covered by the Act"). In *Carroll College*, we, too, recognized that the faculty we exempted under *Catholic Bishop* were part of the College's "governance structure." 558 F.3d at 570; *see also Great Falls*, 278 F.3d at 1337.

In the university setting, teachers' roles vary in ways material to their eligibility for collective representation. Accordingly, in announcing the managerial-faculty exemption in *Yeshiva*, the Supreme Court expressly acknowledged that there might be faculty subgroups "who properly *could* be included in a bargaining unit." 444 U.S. at 690 n.31 (emphasis added). Traditionally, the community of scholars within a university that shares governance with the university's central administration comprises full faculty, not adjuncts. In recently considering a claim that *Yeshiva*'s managerial-faculty exemption encompasses part-time adjuncts, we echoed

*Yeshiva*'s recognition "that faculties are heterogeneous" and that "non-managerial subsets may exist within a faculty entrusted with managerial authority." *Univ. of S. Cal. v. NLRB*, 918 F.3d 126, 129 (D.C. Cir. 2019). In light of those facts, we held that the managerial exemption applies to an identified subset of the faculty only insofar as "that subgroup is structurally included within a collegial faculty body to which the university has delegated managerial authority." *Id*. at 137.

The religious-faculty and managerial-faculty exemptions are not necessarily coterminous, but references to the managerial exemption by courts developing the religious one bespeak judicial recognition that university faculties are structurally heterogenous, and, as *Bayamon* pointed out when it first extended *Catholic Bishop* to higher education, most full-time university faculty were already exempted as managerial. In short, neither the holdings nor the logic of the religious-teacher exemption cases requires uniform exemption of "teachers of any sort," Maj. Op. at 15, based on the unsupported (and often inaccurate) presumption that every religious educational institution's adjuncts have the same relationship to the school's religious exercise as does its regular faculty.

There are powerful practical and institutional reasons why adjuncts need not and should not automatically be equated with regular faculty under *Catholic Bishop*, but may fall closer to non-faculty employees for purposes of NLRA jurisdiction. The image many lawyers and judges have of an adjunct as a salaried or retired professional who moonlights as a law-school professor bears little resemblance to the circumstances of most adjuncts—especially those for whom NLRA rights matter most. Many adjuncts are trained academics seeking opportunities for full faculty status in their chosen disciplines. *See* U.S. Gov't Accountability Office, GAO-18-49, *Contingent*

*Workforce: Size, Characteristics, Compensation, and Work Experiences of Adjunct and Other Non-Tenure-Track Faculty* 14, 24-25 (Oct. 2017) (GAO Report). They fill many "postsecondary instructional positions," *id*. at 10, yet their terms of employment often leave them with little time, space, or opportunity for interaction with students outside of class, with the institution's staff or full-time faculty, or with broader campus life and institutional mission, *id*. at 32, 47-49; *see also* Am. Ass'n for Univ. Professors, *Contingent Appointments and the Academic Profession* 173 (rev. 2014).

A 2017 governmental report found that more than half of the nearly one million contingent teaching positions nationwide "are part-time and have less-than annual contracts or lack faculty status," making them among the "least stable" type of academic appointment. GAO Report at 12-13. The report concluded that the "[p]art-time contingent faculty" it surveyed earned "about 75 percent less per course" than other instructors, *id*. at 35—with median annual earnings falling well below $10,000, *see id*. at 34 tbl.5; *see also* Coal. on the Acad. Workforce, *A Portrait of Part-Time Faculty Members* 2, 10-12 (June 2012)—and that far fewer than half of part-time adjuncts received retirement, health, and life insurance benefits from their employment, *see* GAO Report at 39.

The Duquesne adjuncts at issue here are no exception. Notably, the Executive Resolutions of Duquesne's Board define "adjunct professors" as among the Auxiliary Instructional Staff, who are "*not members of the Faculty*" and "not entitled to Faculty benefits except to the extent these are granted in the letter of appointment." J.A. 737 (emphasis added). (Duquesne's bylaws provide that its Executive Resolutions supersede the faculty handbook, *see* J.A. 397, to which the majority refers, *see* Maj. Op. at 14-15.) The adjuncts have no campus offices and no role in faculty governance. *See*

J.A. 74 ("Adjuncts are not provided with their own office space."), 770 ("Adjunct faculty members do not have voting privileges . . . ."), 780 (defining Faculty Senate, consisting of full-time faculty, as "the deliberative body, the voice, and the primary agent of faculty involvement in University governance"). Department heads at Duquesne contract with adjuncts on a decentralized, per-course, per-semester basis. *See* J.A. 72. "As a rule, adjuncts are responsible only for teaching," J.A. 770; *see also* J.A. 737, often handling "[i]ntroductory language" and "skills courses" to free up "full-time faculty to teach theme courses," J.A. 926. The only record evidence of Duquesne's adjunct compensation shows a 2011 payment of $2,556 for a semester-long, three-credit English course, J.A. 1109, consistent with national data on adjunct pay at the college level, *see* Coal. on the Acad. Workforce at 10.

In sum, the terms of employment of adjuncts make clear that they are not necessarily equivalent to the permanent faculty exempt under *Carroll College*, *Great Falls*, and *Catholic Bishop*. Recognizing potentially material differences, the Board set out in *Pacific Lutheran* to adapt the holding-out test we adopted in *Great Falls* to this new employee group.

## II.  The Board's Approach

### A.  *Pacific Lutheran University*

The Board in *Pacific Lutheran* recognized that whether and how *Catholic Bishop*'s exemption applies to adjunct teachers at religiously affiliated universities presented an open question of substantial importance, so it took up the issue in an especially open and deliberative way. The Board "issued a notice and invitation to file briefs . . . to the parties as well as the general public." 361 N.L.R.B. at 1405. Its notice elicited comments on the series of questions it had posed and prompted

"a broad range of interested parties [to] file[] briefs in response to the Board's invitation." *Id*. at 1405 & n.3.

In developing the test it applied here, the Board in *Pacific Lutheran* acknowledged that it had to "accommodate two competing interests": First, it must respect the First Amendment's Religion Clauses and the cases applying them to religious schools, "avoid[ing] any intrusive inquiry into the character or sincerity of a university's religious views;" and, second, it must "protect[] workers' exercise of their rights under the [NLRA] to the fullest permissible extent" consistent with the Religion Clauses. *Id*. at 1406. Guided by *Great Falls*, the Board held that *Catholic Bishop*'s exemption would reach adjuncts teaching secular subjects, provided the university (1) "holds itself out as providing a religious educational environment," and (2) "holds out" the adjuncts "as performing a specific role in creating or maintaining the university's religious purpose or mission." *Id*. at 1410-11. Thus, for a religious university to exempt its adjunct faculty, it need only publicly make clear that it assigns them a religious role.

By adapting our non-intrusive "holding out" approach from *Great Falls* to the question whether adjuncts count as "faculty" for purposes of the *Catholic Bishop* exemption, the Board explicitly eschewed any "second-guessing" of religiosity. *Id*. at 1412. The Board rejected the test preferred by the union in that case, which would have looked beyond schools' public representations of adjuncts' religious role to demand evidence that "teachers in the proposed unit perform religious functions as part of their jobs." *Id*. at 1408. The Board refused that test out of concern that its "examination of the actual functions performed by employees could raise the same First Amendment concerns as an examination of the university's actual beliefs," which we had rejected in *Great Falls*. *Id*. at 1411. Instead, the Board held:

> [W]e shall decline jurisdiction if the university "holds out" [the adjunct faculty in the proposed bargaining unit], in communications to current or potential students and faculty members, and the community at large, as performing a specific role in creating or maintaining the university's religious purpose or mission. As the D.C. Circuit explained in *Great Falls*, the "holding out" requirement eliminates the need for a university to explain its beliefs, avoids asking how effective the university is at inculcating its beliefs, and does not "coerce[] an educational institution into altering its religious mission to meet regulatory demands." 278 F.3d at 1344-1345.

*Pac. Lutheran*, 361 N.L.R.B. at 1411. The Board stressed that it would "rely on the institution's own statements about whether" the school's religious identity shaped the teachers' roles "without questioning the institution's good faith or otherwise second-guessing those statements." *Id*. at 1412.

The Board reasoned that taking at face value the university's representations about adjuncts' religious role would respect religious exercise but guard against unsupported use of the exemption. The Board's approach dovetails with both the substantive protection of religious rights under *Catholic Bishop* and the process by which we implemented that protection in *Great Falls*, where we explained that relying on the school's public "holding out" rather than the Board's investigation into the school's religious functions avoided entanglement. *See* 278 F.3d at 1344. We were satisfied in *Great Falls* that the holding-out approach notifies prospective faculty of their role in a school's religious environment and, by requiring "public religious identification," provides some assurance that the exemption is warranted. *Id*.

The Board in *Pacific Lutheran* identified the key "holding out" evidence for adjuncts as "documents concerning the recruitment of future staff" that would notify applicants that "performance of their faculty responsibilities would require furtherance of the college or university's religious mission." 361 N.L.R.B. at 1412. This deferential approach asks nothing more of the religious institution than that it hold out its adjuncts as playing a role in creating or maintaining its religious mission. It extends the *Catholic Bishop* exemption to adjuncts only where a university intends and publicly represents that its adjuncts play such role.

The Board in *Pacific Lutheran* calibrated its approach to give a wider berth to schools' religious freedom than did the inquiry the Supreme Court established in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), to decide the related question of which teachers qualify for a "ministerial exception" to employment discrimination laws. The Board recounted that the Court in *Hosanna-Tabor* "did not simply accept the school's assertion that the teacher was a minister," but "found it appropriate, for the purposes of applying [the] ministerial exception, to evaluate the teacher's functions to determine whether the exception applied." *Pac. Lutheran*, 361 N.L.R.B. at 1413-14. In deciding whether a "called teacher" at a religious school fell within the judicially implied "ministerial exception" to federal employment discrimination laws, the Court in *Hosanna-Tabor* started with the same kind of question the Board posed in *Pacific Lutheran*: whether the employer "held . . . out" the teacher as a minister. 565 U.S. at 178, 190-91. Justice Thomas would have stopped there and held the exception applied on that basis alone. *See id*. at 196-98 (Thomas, J., concurring). The rest of the Court, however, proceeded to ask whether the plaintiff also "held herself out as a minister of the Church by accepting the formal call to religious service," *id*. at 191, and probed beyond such

public representations to examine "the circumstances of [her] employment," *id*. at 190, including "the important religious functions she performed for the Church," *id*. at 192.

*Hosanna-Tabor* involved a different judicially fashioned exemption from a different federal statute, but responded to parallel First Amendment concerns. It thus suggests that the Board's own approach in *Pacific Lutheran*, which was substantially more deferential to religious schools than the Supreme Court's inquiry in *Hosanna-Tabor*, gives ample protection to school leadership's free-exercise rights.

## B. *Duquesne University of the Holy Spirit*

No party in *Pacific Lutheran* petitioned this court for review, and the Board has since applied its adjunct-specific holding-out test in other cases, including this one. *See* Maj. Op. at 13 n.1. Adjuncts at Duquesne's McAnulty College and Graduate School of Liberal Arts voted overwhelmingly in favor of the union, *see* J.A. 14, and Duquesne initially stipulated to an election agreement, *see* J.A. 68, but later changed course to assert that its adjuncts are jurisdictionally exempt under *Catholic Bishop*, *see* J.A. 68-69 & n.5.

After receiving evidence and argument on *Pacific Lutheran*'s application, the Regional Director determined that Duquesne does not "hold[] out its adjunct professors who are members of the petitioned-for bargaining unit as serving any role in creating or maintaining the [University's] religious educational environment." J.A. 78. (The Board later amended the allowed bargaining unit to exclude the adjuncts teaching in the religion department. *See* J.A. 138-139.) "While there is voluminous evidence in the record concerning [Duquesne's] religious identity and its stated Mission," the Regional Director found, "there is scant evidence that adjuncts are expected to act in any way to advance the [University's] religious message or

to do anything with regard to it, other than to not be openly hostile to it." J.A. 77. There was, in particular, a "lack of evidence that adjuncts are informed of any requirement of participation with respect to conveying or supporting [Duquesne's] mission." J.A. 78. The adjunct job announcements, employment contracts, interviews, and other aspects of Duquesne's adjunct hiring process did not mention any religious role, duties, or relation of the adjuncts to the school's religious mission. *See* J.A. 72-74.

At bottom, reasonable adjunct candidates "would not conclude that any religious responsibilities were required by their job duties" with Duquesne. J.A. 78. The Regional Director noted that the adjuncts were undoubtedly aware that Duquesne is a Catholic school, but found that such "awareness is not the equivalent of contributing to" or "advocating for" the school's religious character or identity, and Duquesne "makes no claim that the adjunct instructors . . . play any role in contributing to the University's mission or religious environment." J.A. 77.

Whether Duquesne's adjuncts fall within *Catholic Bishop*'s constitutional-avoidance-based religious-teacher exemption is the only issue properly before us under 29 U.S.C. § 160(e), because Duquesne never claimed to the agency that the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, "provides a separate and independent basis" to deny NLRA protection, Pet'r Br. 52.

### III. *Pacific Lutheran* Applies the NLRA Consistently with Religion-Clause Precedent

#### A. Where We Agree and Disagree

Although I believe the majority errs in invalidating the Board's holding-out methodology for deciding when adjunct

teachers at religious schools fall within *Catholic Bishop*'s exemption from the NLRA, our disagreement is relatively narrow.  I note especially three areas of substantial agreement.

*First*, Duquesne does not claim, and the court does not rule, that *Catholic Bishop* exempts all employees of a religious school from NLRA coverage.  Duquesne acknowledges that *Great Falls* applies only to "faculty," Pet'r Br. 28, and that Duquesne itself "collectively bargains with unions representing non-faculty staff," *id*. at 2.  My colleagues, too, limit their decision to teachers—albeit "teachers of any sort." Maj. Op. at 15; *see id*. at 23 (not addressing "cases involving religious schools and their non-faculty employees").

Indeed, no court has understood *Catholic Bishop* to exempt all staff of any religious "institution" or "school" from the NLRA.  *See Passaic Daily News v. NLRB*, 736 F.2d 1543, 1556 n.20 (D.C. Cir. 1984) ("In *Catholic Bishop*, the only question the Court addressed was whether the [NLRA] conferred jurisdiction over teachers who taught both religious and secular subjects in church operated schools."); *see also Volunteers of Am., L.A. v. NLRB*, 777 F.2d 1386, 1389-90 (9th Cir. 1985) (not reading *Catholic Bishop* to exempt employees of church-operated "alcohol treatment centers"); *NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.*, 763 F.2d 1, 6 (1st Cir. 1985) (same, as to church-operated day care center employees); *VOA-Minn.-Bar None Boys Ranch v. NLRB*, 752 F.2d 345, 348-49 (8th Cir. 1985) (same, as to employees of a church-operated residential treatment center); *Denver Post of the Nat'l Soc'y of the Volunteers of Am. v. NLRB*, 732 F.2d 769, 772-73 (10th Cir. 1984) (same, as to employees at a religious organization's temporary shelter for women and children), *overruled on other grounds by Aramark Corp. v. NLRB*, 179 F.3d 872, 874 & n.2 (10th Cir. 1999); *St. Elizabeth Hosp. v. NLRB*, 715 F.2d 1193, 1196 (7th Cir. 1983) (same, as to a

religiously affiliated hospital's employees); *Tressler Lutheran Home for Children v. NLRB*, 677 F.2d 302, 305 (3d Cir. 1982) (same, as to a church-affiliated nursing home's employees). Instead, courts have uniformly understood *Catholic Bishop*'s application to turn on the "critical and unique role of the teacher in fulfilling the mission of a church-operated school," 440 U.S. at 501, and not to extend to all employees of religiously affiliated or managed institutions. *See, e.g.*, *Denver Post*, 732 F.2d at 773 (citing *Tressler*, 677 F.2d at 305); *NLRB v. St. Louis Christian Home*, 663 F.2d 60, 63-64 (8th Cir. 1981); *NLRB v. Bishop Ford Cent. Catholic High Sch.*, 623 F.2d 818, 822 (2d Cir. 1980).

I read our prior cases' references to the "institution," *Great Falls*, 278 F.3d at 1347, and the "school," *Carroll Coll.*, 558 F.3d at 572, to decide only whether the entity is sufficiently religious such that teachers in roles comparable to those in *Catholic Bishop* fall outside the NLRA. Those cases considered only the main faculty body—the same body exempted in *Catholic Bishop*—and we passed on the school's eligibility for the religious-teacher exemption without addressing bargaining units beyond the main faculty.

*Second*, there is no dispute within our panel that today's decision interprets an NLRA-specific exemption and does not limit the applicability of any other workplace laws to religious-school teachers, much less to any other staff. The majority affirms that its opinion does not "address the powers of other agencies in cases involving different statutes or constitutional provisions." Maj. Op. at 23. As already discussed, although the judicially implied "ministerial exemption" responds to concerns similar to those that animated *Catholic Bishop*, it operates in a more functionally tailored way, and is a waivable affirmative defense, not a jurisdictional bar. *See Hosanna-Tabor*, 565 U.S. at 195 n.4. Similarly, the more limited

exemption of religious organizations from Title VII's prohibition of religious discrimination is explicit in the text of that statute, 42 U.S.C. § 2000e-1(a); *see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987), and does not purport to strip employees of NLRA coverage or any other workplace rights, including protection against discrimination on grounds other than religion. We should take care to avoid suggesting that cases such as these support exempting entire "religious organizations" from workplace regulation. *Cf.* Maj. Op. at 2, 6-7, 18-19.

*Third*, my colleagues and I agree that a religious school should be able to decide that its adjunct faculty are *not* encompassed within the *Catholic Bishop* exemption. As the majority puts it, "whether the Board could exercise jurisdiction over a religious school that formally and affirmatively disclaims any religious role for certain faculty members" remains an open question. Maj. Op. at 19 n.2. Thus, at the end of the day, our difference may boil down to defining the default rule: In my view, the Board appropriately treated the *Catholic Bishop* exemption as presumptively limited to the regular faculty unless the school holds out its adjuncts as playing a like religious role, whereas the majority deems "teachers of any sort" automatically exempt, but suggests those adjuncts might have NLRA rights if their school "affirmatively disclaims" any religious role for them.

I would affirm the Board's approach because, as we described in *Great Falls*, a key role of the holding-out requirement was to "provide[] reasonable assurance that the *Catholic Bishop* exemption will not be abused." 278 F.3d at 1345. The purpose of preventing over-claiming of the exemption is served by the Board's placement of the holding-out burden on the school. As a practical matter, it seems natural

that a religious university that stands to benefit from a blanket exemption might do nothing rather than make the disclaimer as to its adjuncts. That seems especially likely where its alternative is to "formally and affirmatively disclaim[] any religious role" for its adjuncts—a step that a religious school that does not cast its adjuncts in a religious role but still hopes to attract them may not want to take. The Board's contrary default rule, while highly deferential of religious schools' First Amendment rights, is better designed to deter an institution from treating as exempt adjuncts who should not be.

The exemption's jurisdictional character further supports requiring the school to invoke rather than disclaim the exemption for its adjuncts. The majority does not explain how even a formal and affirmative disclaimer would be effective to waive a jurisdictional exemption. But we assuredly can give religious schools that choice—and avoid ascribing religiosity where a religious school itself did not—if we recognize that the exemption's application beyond the core faculty depends on the school affirmatively holding out adjuncts in a way that justifies the exemption's application to them.

*Pacific Lutheran* is not fairly characterized as "incompatib[le] with the Religion Clauses." Maj. Op. at 22. The Board's *Pacific Lutheran* test asks whether an objective observer would understand the university's own communications to "hold out" the employees it seeks to exempt as having a role in "creating or maintaining the university's religious purpose or mission." 361 N.L.R.B. at 1411. There is nothing unconstitutional about making a religious university's eligibility for an implied statutory exemption turn on such a holding-out inquiry. *See Hosanna-Tabor*, 565 U.S. at 190-92 (relying in part on an employee-specific holding-out inquiry); *Great Falls*, 278 F.3d at 1344 (considering whether a school "holds itself out to the public as religious").

### B. *Pacific Lutheran*'s Default Rule Respects Precedent and Religious Freedom

The grounding of the *Catholic Bishop* exemption in constitutional avoidance, notwithstanding the NLRA's plain text defining "employee" and "employer" without exception for teachers at religiously affiliated schools, supports the relatively circumspect approach the Board took in *Pacific Lutheran*. The Board recognized the exemption of all permanent faculty of any school that qualifies as religious under *Catholic Bishop*, *Great Falls*, and *Carroll College*, but decided against automatically sweeping in all short-term, part-time adjuncts. *See Pac. Lutheran*, 361 N.L.R.B. at 1410-13. Rather, the Board recognized the exemption of adjuncts only where the university "holds out" its adjuncts as playing a religious role—but in doing so it used a highly deferential, easy-to-meet standard. *See id*. As already explained, that additional holding-out requirement is warranted given that adjuncts and full faculty frequently play materially different roles in higher education, and thus may not equally implicate a school's religious exercise.

One need not question the holding of *Catholic Bishop* to appreciate that, given its reliance on now-disfavored methods of discerning statutory meaning and employing constitutional avoidance, we should hesitate to expand its reach. *Catholic Bishop* identified no relevant ambiguity in the NLRA's "very broad terms," 440 U.S. at 504, nor any suggestion (beyond silence) in the legislative history that Congress intended to exclude teachers at religious schools from the Act's coverage, *see id*. at 504-06. The Court has recently reiterated that the canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a provision" that "'has no application' in the interpretation of an unambiguous statute." *McFadden v. United States*, 135 S. Ct.

2298, 2307 (2015) (quoting *Warger v. Shauers*, 574 U.S. 40, 50 (2014)).  And because "silence in the legislative history cannot" alter a statute's explicit terms, *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018), the NLRA legislative history's mere failure to mention religious schools does not support building out *Catholic Bishop*'s constitutional-avoidance construction.

The Supreme Court has also more recently described the constitutional shoals that *Catholic Bishop* sought to avoid as less monolithic than there described.  *Catholic Bishop* worked from the premise that "[r]eligious authority necessarily pervades" even the apparently secular aspects of parochial schools.  440 U.S. at 501 (quoting *Lemon*, 403 U.S. at 617). But the Court has updated that "antiquated" view with a more nuanced recognition that not every function of a religious school necessarily instantiates the school's religiosity. *Agostini v. Felton*, 521 U.S. 203, 223 (1997); *see also Mitchell v. Helms*, 530 U.S. 793, 858 (2000) (O'Connor, J., joined by Breyer, J., concurring in the judgment of the plurality).  The Court's longstanding recognition that religion is less likely to "permeate the area of secular education" in "church-related colleges and universities" than in "primary and secondary schools," *Hunt v. McNair*, 413 U.S. 734, 746 (1973) (quoting *Tilton v. Richardson*, 403 U.S. 672, 687 (1971) (Burger, C.J.) (plurality opinion)), further suggests that *Pacific Lutheran*'s decision to treat adjuncts at religious institutions of higher education as not automatically exempt, but exempted where the school holds out its adjuncts as helping to create or promote its religious mission, does not raise the same serious constitutional questions that *Catholic Bishop* contemplated.

The Board's decision to require that a religious university affords clear notice to adjuncts that it casts them in a role of religious significance is especially warranted given the unusual

character of this exemption. It does not depend on any claim on the school's part that collective representation contravenes its faith. And it reaches teachers without regard to whether they are members of the faith, or even held out as furthering the school's religious mission. The *Catholic Bishop* exemption is thus unlike the express Title VII exemption, 42 U.S.C. § 2000e-1(a), which merely allows religious organizations to favor co-religionists. It is also unlike the ministerial exemption, which removes antidiscrimination protections from a subgroup of employees who work as "ministers"—*i.e.*, co-religionists of a faith-based employer who perform "important religious functions" for it. *Hosanna-Tabor*, 565 U.S. at 192. The exemption Duquesne claims here applies to adjuncts not cast as "ministers," and who are hired without regard to their religion. *See* J.A. 72, 752-753, 755. It removes their NLRA coverage on the premise that their teaching, regardless of its advertised character and regardless of how the university holds them out, carries undisclosed religious agency for the university's leadership with which collective representation might interfere.

The majority's categorical application is less respectful of individuals' religious liberty than is the Board's more nuanced approach. The exemption casts the adjuncts as instruments of the Spiritan Catholic faith, notwithstanding that the adjuncts' own internal motivation and understanding of the value of teaching at Duquesne could be secular or even inspired by a different faith. It is a hallmark of the religious and intellectual pluralism and freedom of our society and our workplaces— especially in universities and other institutions of higher education—that people work together peacefully and productively, fulfill shared expectations, and inspire one another, even as they act with and for distinct and even conflicting reasons, whether secular, religious, or both. Given that reality, the Board does not ask too much in *Pacific*

*Lutheran* by requiring that a religious university claiming the exemption of its adjuncts put them on notice that their work will be treated as instrumental to their employer's faith.

The majority's categorical application is also less respectful of the religious freedom of religious schools than is the Board's more nuanced approach. An automatic, blanket exemption does not recognize that religious institutions of higher education are not all religious in the same way, and that those differences in how they define their religious communities are central to religious pluralism and therefore religious liberty. Unlike a jurisdictional presumption that all adjuncts at every religious school function like the parochial-school teachers in *Catholic Bishop*, the Board's acceptance of each religious university's public representations as to whether and how adjunct faculty play a role in its religious identity is more respectful of universities' religious freedom and thus better comports with the Free Exercise Clause.

Not every religious school's religious character necessarily requires that its adjuncts leave their NLRA rights at the door. A holding that presumes as a jurisdictional matter that all genuinely religious universities have no labor law coverage for their adjuncts imposes a fixed religious footprint at corresponding cost on every religious school, including schools that may not want, and adjuncts who may not have expected, that cost. Because I conclude that the Board's answer to the open question whether *Catholic Bishop* applies to adjunct teachers at religious schools better protects the religious liberty the First Amendment secures and more faithfully follows the NLRA's broad, remedial scheme, I respectfully dissent.