# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed On: September 17, 2020

No. 18-1063

DUQUESNE UNIVERSITY OF THE HOLY SPIRIT,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ALLIED-INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,
INTERVENOR

———

Consolidated with 18-1078

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

On Petition for Rehearing En Banc

———

Before: SRINIVASAN, *Chief Judge*; HENDERSON, ROGERS, TATEL, GARLAND, GRIFFITH**, MILLETT, PILLARD*, WILKINS, KATSAS, RAO AND WALKER***, *Circuit Judges*.

## O R D E R

Upon consideration of the petition of intervenor for rehearing en banc, the responses thereto, and the absence of a request by any member of the court for a vote, it is

**ORDERED** that the petition be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:     /s/
Daniel J. Reidy
Deputy Clerk

* A statement by Circuit Judge Pillard, concurring in the denial of rehearing en banc, is attached.

** Circuit Judge Griffith was a member of the panel that decided this case but retired prior to the disposition of the petition.

*** Circuit Judge Walker did not participate in this matter.

PILLARD, *Circuit Judge*, concurring in the denial of rehearing *en banc*:  I continue to believe that, under our precedent, this case was wrongly decided for the reasons stated in my dissent.  The majority abrogates *Pacific Lutheran University*, 361 N.L.R.B. 1404 (2014), without even acknowledging the extraordinary deference that decision paid to religious schools.  The whole point of the NLRB's *Pacific Lutheran* analysis was to studiously avoid examination of the faculty members' actual religious duties by looking to whether a religious school itself "holds out" faculty members as playing an identified role in its religion.  *See Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 843-44 (D.C. Cir. 2020) (Pillard, J., dissenting).  Like the analysis this court fashioned in *Carroll College, Inc. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009), and *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), the Board's approach in *Pacific Lutheran* stopped short of looking behind the openly stated positions of the schools regarding their own religious practice.  In other words, the NLRB went out of its way to demonstrate the respect for religious schools that the First Amendment's Religion Clauses require.  Yet the majority concludes that this doctrine "impermissibly intrudes into religious matters" as reason to hold Duquesne's adjuncts unprotected by the baseline workplace rights Congress afforded in the NLRA.  *Duquesne*, 947 F.3d at 834.

If anything, *Pacific Lutheran*'s "holding out" approach went beyond what the First Amendment requires.  There is strong reason to believe that a school's public representations, taken alone, cannot justify carving out textually rootless exemptions from religiously neutral, generally applicable workplace laws.  The panel majority assumes that "examining whether faculty members play religious or non-religious roles . . . 'would only risk infringing upon the guarantees of the First Amendment Religion Clauses.'"  *Id.* at 833 (quoting *Carroll Coll.*, 558 F.3d at 572).  But the Supreme Court has repeatedly held in the parallel context of the "ministerial

exception" to employment discrimination laws that the EEOC and the courts may look to employees' actual religious roles—not just the titles or descriptions proffered, or "held out," by religious employers—without running afoul of the Religion Clauses. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063-65 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 192-94 (2012); *id.* at 198 (Alito, J., concurring). The panel never explains why the Board's *Pacific Lutheran* analysis threatened religious exercise even though it was substantially more deferential to religious schools than the Supreme Court's ministerial exception.

The panel defends its holding as following ineluctably from *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), and this court's ensuing decisions in *Great Falls* and *Carroll College*. We are, of course, bound by *Catholic Bishop*, as we are by our own decisions unless and until we convene *en banc* to revisit them. But, for reasons that I have already explained, *see Duquesne*, 947 F.3d at 839-43, this case is materially different from each of those, and, fairly read, *Pacific Lutheran* honored all the precedents the majority invokes to the contrary. On its own terms, then, the majority gets it wrong. *Id.*

More fundamentally, our precedent extending *Catholic Bishop* is unmoored and increasingly untenable. We should take the opportunity in an appropriate case to reconsider it. *En banc* review in this case would give us an opportunity to reverse the majority's erroneous holding. But because no party asked us to revisit *Great Falls* and *Carroll College*—the cases on which the majority's holding builds—*en banc* review is not now the right vehicle to correct our wrong turn.

Looking ahead, two points bear emphasis. *First*, *Catholic Bishop* rests on an outmoded form of constitutional avoidance. Even as we respect it as binding precedent, we should not extend its reach beyond what the decision requires. To the extent that we have done so not only in this case, but in *Carroll College* and *Great Falls*, the decisions may need to be rethought. *Cf. Allegheny Def. Project v. FERC*, 964 F.3d 1, 17-18 (D.C. Cir. 2020) (*en banc*) (holding departure from circuit precedent justified in part because it was "grounded in a mode of statutory construction that ha[d] been foreclosed by the Supreme Court"). *Second*, constitutional avoidance is inapplicable once the constitutional difficulty said to be avoided has been surmounted, as has occurred regarding the ostensible entanglement problem that motivated our adoption of *Great Falls*' "holding out" test in the first place.

The canon of constitutional avoidance is "a tool for choosing between competing plausible interpretations of a provision" that "'has no application' in the interpretation of an unambiguous statute." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (quoting *Warger v. Shauers*, 574 U.S. 40, 50 (2014)). The Supreme Court in *Catholic Bishop* identified no ambiguity in the NLRA's "very broad terms." 440 U.S. at 504. Five years later, the Court described the breadth of the NLRA's definition of "employee" as "striking"—"subject only to certain specifically enumerated exceptions," none of which relate to religious schools. *Sure-Tan, Inc v. NLRB*, 467 U.S. 883, 891 (1984). The *Catholic Bishop* Court, however, located ambiguity in the legislative history; it concluded that the absence of express congressional committee or floor discussion of collective bargaining in connection with "church-operated schools" justified constitutional avoidance, the text's plain scope notwithstanding. *See* 440 U.S. at 504-06. That inverted method of statutory interpretation—bypassing clear text and

looking to silence in the legislative history as ground for a judicial carveout—was abandoned a generation ago.

In fact, in a case decided just six years after *Catholic Bishop*, a unanimous Court got the analysis right: faced with a claim by a religious foundation that it was not subject to the Fair Labor Standards Act, the Court first held that the statute's "exceedingly broad" definition of "employees" extended to the foundation's associates and only then turned to address the constitutional question directly. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295-306 (1985). Today, "silence in the legislative history, 'no matter how "clanging,"'" cannot defeat the better reading of the text and statutory context" or create ambiguity where there is none. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985)). There is no statutory basis whatsoever on which to conclude that Congress intended to exempt parochial-school teachers from the NLRA. The doctrine of constitutional avoidance does not empower courts to drop ordinary principles of statutory interpretation to cut our own holes in enacted laws whenever a serious constitutional issue appears on the horizon.

To be sure, *Catholic Bishop*'s holding is binding on this court whether or not we convene *en banc* to reconsider our own cases extending it. The Supreme Court has made clear that "[p]rinciples of *stare decisis* . . . demand respect for precedent whether judicial methods of interpretation change or stay the same." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 456 (2008). And the Court's recent ministerial exception decisions suggest *Catholic Bishop*'s core holding—that parochial high school teachers are exempt from NLRA coverage—remains on firm foundation substantively. In *Hosanna-Tabor* and *Our Lady of Guadalupe*, the Court required that school teachers who serve an important "role in conveying [a religious

school's] message and carrying out its mission" be exempted from federal employment discrimination laws. *Our Lady of Guadalupe*, 140 S. Ct. at 2063 (quoting *Hosanna-Tabor*, 565 U.S. at 192). Much of the reasoning in these cases is consistent with the logic behind *Catholic Bishop*. *Compare, e.g.*, *id.* at 2055 (exempting decisions about "the selection and supervision of the teachers" responsible for "education and formation of students" in religious schools to avoid "undermin[ing] the independence of religious institutions in a way that the First Amendment does not tolerate"), *with Catholic Bishop*, 440 U.S. at 496 (citing concern that Board jurisdiction would "impinge upon the freedom of church authorities to shape and direct teaching in accord with the requirements of their religion"). The Supreme Court's conclusion in *Catholic Bishop* would appear to stand even absent the screen of constitutional avoidance.

But respect for the binding force of *Catholic Bishop* does not demand the "holding out" approach we devised as further avoidance. We cannot kick the can down the road indefinitely, never actually deciding whether and how the NLRA's application to distinct categories of employees is limited by the Religion Clauses. *Catholic Bishop*'s stature as binding precedent as to high school teachers responsible for guiding students' religious education does not license us to expand its holding to cut out from the NLRA additional categories of "employers" or "employees" based on unfocused Religious Clause concerns brought to bear via miscast constitutional-avoidance reasoning. *See Catholic Bishop*, 440 U.S. at 502 (noting that "we are not compelled to determine whether the entanglement is excessive as we would were we considering the constitutional issue"). The Supreme Court has never applied *Catholic Bishop* to institutions of higher education nor has any majority decision for an appellate court other than ours. *Cf. Universidad Cent. de Bayamon v. NLRB*, 793 F.2d 383, 401

(1st Cir. 1985) (equally divided *en banc*) (Breyer, J.) (describing the question whether an "institution of higher education falls within the strictures of *Catholic Bishop*" as "an important, likely recurring, question that calls for Supreme Court guidance"). It is not immediately clear why an NLRA carveout designed for teachers at parochial schools should apply to part-time, non-religious, college or university adjunct instructors—or what would then stop its further extension to information technology support staff, cafeteria workers, or campus security, or, for that matter, to hundreds of thousands of other employees at religious hospitals or other religiously governed organizations. The constitutional rationale for excluding from the NLRA teachers with a role in transmitting the faith is not obviously implicated in the case of teachers lacking such function. It is even less clear why other employees the NLRA's plain text reaches but who lack any demonstrated role in the employer's faith mission might also be excepted. As I have explained, neither adjuncts, nor the wide range of non-teaching staff that religious educational institutions employ, should simply be equated with the parochial-school teachers in *Catholic Bishop*. *See Duquesne*, 947 F.3d at 840-42 (Pillard, J., dissenting); *cf. id.* at 836 (majority opinion) (suggesting the question whether NLRB "may . . . assert jurisdiction over *some* non-faculty employees" remains open). Faced with a religious university's claim that the choice by a distinct category of its adjuncts to be represented by a union interfered with its religious exercise, entangling the NLRB in its religious workings, we should have identified and decided the constitutional question, as the Court itself did in the parallel context of *Hosanna-Tabor* and *Our Lady of Guadalupe*. When we skirt such questions on constitutional avoidance grounds, we carve out ill-defined exemptions from duly enacted statutes, likely exceeding what the Constitution itself compels.

Addressing the constitutional question head-on, the Court's ministerial exception cases show that we took a wrong turn in *Great Falls* and *Carroll College*. Just two months ago, in *Our Lady of Guadalupe*, the Court signaled that there is no constitutional impediment to distinguishing employees who are the heart of the religious mission from those who are not. The Court rejected any "rigid test" for determining who falls within the ministerial exception, requiring that courts instead "take all relevant circumstances into account and . . . determine whether each particular position implicated the fundamental purpose of the exception." 140 S. Ct. at 2067. Only two Justices endorsed the view that courts ought to just outright "defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial.'" *Id.* at 2069-70 (Thomas, J., concurring). By contrast, while recognizing the fact that the schools at issue "expressly saw [their employees] as playing a vital part in carrying out the mission of the church" as "important," the majority also weighed "abundant record evidence that [the employees at issue] performed vital religious duties." *Id.* at 2066 (majority opinion). In so doing, it suggested that inquiry into an employee's religious role does not present any First Amendment problem. *Cf. id.* at 2071 (Thomas, J., concurring) ("[C]oncerns of entanglement have not prevented the Court from weighing in on the theological questions of which positions qualify as 'ministerial.'"). These decisions call into question the reasoning that underlies *Great Falls* and *Carroll College*—cases that seem to hold *any* inquiry behind a religious school's public representations to be necessarily out of bounds. *See Carroll Coll.*, 558 F.3d at 573; *Great Falls*, 278 F.3d at 1344. Such a hands-off approach risks "deny[ing] protection to workers the [NLRA] was designed to reach" for no good First Amendment reason. *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996).

Duquesne sidesteps the teaching of the ministerial exception cases, emphasizing that the NLRA and antidiscrimination statutes constitute distinct bodies of law. *See* Resp. to Pet. for Reh'g at 14-16. But the question is whether their differences are constitutionally relevant. Duquesne characterizes antidiscrimination law as "retrospective" in an effort to distinguish the ministerial exception's "more searching review." *Id.* at 15. Antidiscrimination statutes are "necessarily focused on the individual bringing suit," says Duquesne, so unlike the NLRA, which facilitates "bargaining over a variety of as-yet-unknown conditions of employment." *Id.* But reality reflects no such neat dichotomy. Both bodies of law have retrospective force: the initial adjudicating agency may differ (EEOC versus the NLRB), but under either regime employees may present claims that their workplace rights have been violated. Both bodies of law also operate prospectively, projecting compliance obligations on employers that shape their ongoing interactions with employees.

The suggestion that the NLRA imposes intrusive, continuous duties whereas antidiscrimination law does not thus overlooks the effects of the latter on employers' hiring, recruitment, and evaluation. *See, e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (describing Title VII's "primary objective" as "prophylactic"). To the extent that there is a difference, the NLRA arguably entails *less* substantive imposition because it is limited to process: it sets the rules that govern negotiations toward agreed-upon contracts but, unlike antidiscrimination law, does not impose substantive terms of employment top-down. In the absence of any reason why merely negotiating with their employees' chosen representatives interferes with religious schools' constitutional prerogatives, the Religion Clauses must afford the same leeway

to operation of the NLRA as they do federal employment discrimination laws.

In any event, these questions are worth examining in a future case. The NLRB's recent decision to "adopt" the majority's understanding of *Great Falls*' test and disavow jurisdiction over all teachers, including adjunct faculty "of self-identified religious schools," *Bethany Coll.*, 369 N.L.R.B. No. 98, 2020 WL 3127965 (June 10, 2020), does not eliminate our obligation to resolve the extent to which the Religion Clauses curtail the application of the NLRA to teachers at religious schools. Indeed, insofar as "refusal by the agency to institute proceedings [is] based solely on the belief that it lacks jurisdiction" under *Great Falls* and *Catholic Bishop*, the NLRB's decision will command our review. *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985). Given that cases raising these issues are already waiting in the wings, *see Duquesne*, 947 F.3d at 832 n.1 (noting our orders in *Manhattan College v. NLRB*, No. 18-1113 (D.C. Cir. June 26, 2018), and *Saint Xavier University v. NLRB*, No. 18-1076 (D.C. Cir. Sept. 19, 2018), holding both petitions for review in abeyance pending *Duquesne*'s resolution), I expect there will soon be an opportunity to reconsider our precedent expanding on *Catholic Bishop*.

When that opportunity does arrive, we must be exceedingly careful to ensure that any course correction we undertake does not "depriv[e] [a] church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188. As the Supreme Court has reminded us, employment matters have the potential to "affect[] the faith and mission of [a] church itself." *Id.* at 190. These constitutionally prized attributes of religious practice deserve our continued respect. Such respect need not come at the expense of workplace rights of those employees who do not

personify a religious school's beliefs, nor does it depend on conferring the broadest exemption at institutions whose religious character might readily accommodate labor protections alongside their faith. I trust that we can discern the extent to which the First Amendment requires religious schools be shielded from NLRA obligations in a manner appreciative of the autonomy they maintain over their mission. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060. Because those important issues have not been squarely raised before us in this case, I concur in denial of the petition for rehearing *en banc*.